**Slip Op. 11-16**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| LIFESTYLE ENTERPRISE, INC., TRADE MASTERS OF TEXAS, INC., EMERALD HOME FURNISHINGS, LLC, RON'S WAREHOUSE FURNITURE D/B/A VINEYARD FURNITURE INTERNATIONAL LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| and | : | |
| DREAM ROOMS FURNITURE (SHANGHAI) CO., LTD., GUANGDONG YIHUA TIMBER INDUSTRY, CO., LTD., | : | |
| Consolidated Plaintiffs, | : | |
| ORIENT INTERNATIONAL HOLDING SHANGHAI FOREIGN TRADE CO., LTD., | : | |
| Intervenor Plaintiff, | : | |
| v. | : | Before: Jane A. Restani, Judge |
| UNITED STATES, UNITED STATES DEPARTMENT OF COMMERCE | : | Consol. Court No. 09-00378 |
| | : | **Public Version** |
| Defendants, | : | |
| and | : | |
| AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE, VAUGHAN-BASSETT FURNITURE COMPANY, INC. | : | |
| Intervenor Defendants. | : | |

## OPINION AND ORDER

[In antidumping duty matter plaintiffs' motions for judgment on agency record granted in part and denied in part. The intervenor defendants' motion for judgment on agency record granted in part and denied in part. Commerce's requests for voluntary remand granted.]

Dated: February 11, 2011

Mowry & Grimson, PLLC (Kristin H. Mowry, Jeffrey S. Grimson, Jill A. Cramer, Sarah M. Wyss, and Susan E. Lehman) for the plaintiffs.[1]

Wilmer, Cutler, Pickering, Hale & Dorr, LLP (Patrick J. McLain and John D. Greenwald) for consolidated plaintiff, Guangdong Yihua Timber Industry Co., Ltd.

Garvey Schubert Barer (William E. Perry) for consolidated plaintiff, Dream Rooms Furniture (Shanghai) Co., Ltd.

Arent Fox LLP (Nancy A. Noonan and Matthew L. Kanna) for the intervenor plaintiff, Orient International Holding Shanghai Foreign Trade Co., Ltd.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini), for the defendants.

King & Spalding LLP (J. Michael Taylor, Joseph W. Dorn, Daniel L. Schneiderman, Steven R. Keener, and Prentiss L. Smith) for the intervenor defendants.

Restani, Judge: This action challenges the Department of Commerce's

("Commerce") final results rendered in the third antidumping ("AD") duty review of certain

wooden bedroom furniture ("WBF") from the People's Republic of China ("PRC"). See

Wooden Bedroom Furniture from the People's Republic of China: Final Results of Antidumping

Duty Administrative Review and New Shipper Reviews, 74 Fed. Reg. 41,374, 41,374 (Dep't

Commerce Aug. 17, 2009) ("Final Results"); Wooden Bedroom Furniture From the People's

---

[1] Mowrey & Grimson, PLLC withdrew as counsel for Ron's Warehouse Furniture on January 6, 2011. Ron's Warehouse Furniture has not retained substitute counsel as of the date of this opinion.

Republic of China: Amended Final Results of Antidumping Duty Administrative Review and

New Shipper Reviews, 74 Fed. Reg. 55,810, 55,810 (Dep't Commerce Oct. 29, 2009)

("Amended Final Results").   The plaintiffs, Lifestyle Enterprise, Inc. ("Lifestyle"), Orient

International Holding Shanghai Foreign Trade Co., Ltd. ("Orient"), Guangdong Yihua Timber

Industry Co., Ltd. ("Yihua Timber"), Dream Rooms Furniture (Shanghai) Co., Ltd. ("Dream

Rooms"), Ron's Warehouse Furniture, Emerald Home Furnishings, LLC, and Trade Masters of

Texas, Inc., submitted motions for judgment on the agency record.  The intervenor defendants,

American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture

Company, Inc. (collectively "AFMC") submitted a motion for summary judgment on the agency

record.[2]  For the reasons stated below, the court holds that the plaintiffs' and intervenor

defendants' motions are granted in part and denied in part.  Commerce's motion for voluntary

remand is granted.

## BACKGROUND

In January 2005, Commerce published the AD duty order on WBF from the PRC.

Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty

Order: Wooden Bedroom Furniture From the People's Republic of China, 70 Fed. Reg. 329, 329

(Dep't Commerce Jan. 4, 2005).  On January 31, 2008, AFMC requested an administrative

review of 213 exporters and producers of merchandise entered into the United States between

January 1, 2007 and December 31, 2007, thereby triggering the third administrative review of

WBF.  Def.'s App. to Resp. to Mot. for J. Upon the Admin. R. ("Def.'s App.") Doc. 18.  On

---

[2] Lifestyle is the U.S. importer of WBF from Orient, Yihua Timber, and Dream Rooms. Orient, Yihua Timber, and Dream Rooms are PRC-based producers of WBF.  AFMC is an organization representing U.S. manufacturers of WBF.

February 27, 2008, Commerce published a notice that it would initiate an administrative review

and would publish a separate initiation notice for WBF containing additional detail.  Initiation of

Antidumping and Countervailing Duty Administrative Reviews, 73 Fed. Reg. 10,422, 10,422

(Dep't Commerce Feb. 27, 2008) ("February Notice").  On March 7, 2008, Commerce published

a notice initiating the WBF administrative review and identifying the 228 exporters and

producers under review.  Notice of Initiation of Administrative Review of the Antidumping Duty

Order on Wooden Bedroom Furniture From the People's Republic of China, 73 Fed. Reg. 12,387,

12,387 (Dep't Commerce Mar. 7, 2008) ("March Notice").

On March 11, 2008, Commerce informed the parties of its intent to limit the

number of individually reviewed respondents and identified the March Notice as the initiation

notice.  Def.'s App. Doc. 48, 347.  Commerce accepted withdrawal from review within 90 days

of publication, i.e., from March 7 until June 5, 2008.  Def.'s App. Doc. 347, at 2; see 19 C.F.R.

§ 351.213(d)(1).  Commerce selected for review the two largest exporters by volume as of June

6, 2008: Yihua Timber and Orient.  Def.'s App. Doc. 347, at 7.  Commerce informed Orient that

its questionnaire response was deficient.  Def.'s App. Doc. 366, 368.  Orient requested to

withdraw the confidential version of its questionnaire response    but not its separate rate

certification[3]    and informed Commerce it would significantly limit its participation in the

_____

[3] Commerce requires companies operating in a non-market economy ("NME") such as China to submit documentation demonstrating their independence from government control.  If a company does so, it receives a separate rate certification and its own rate.  Transcom, Inc. v. United States, 294 F.3d 1371, 1371 (Fed. Cir. 2002).  If a company fails to do so, it is assigned the rate applicable to all entities controlled by the government, i.e., a country-wide rate.  Id. Commerce's test for whether a company is eligible for a separate rate focuses on control over investment, pricing, and the output decision-making process at the individual firm.  Fuyao Glass Indus. Grp. v. United States, 27 CIT 1892, 1896 n.8 (2003).

review.  Def.'s App. Doc. 374, at 1  2.

In February 2009, Commerce published its preliminary results.  Wooden Bedroom Furniture From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative and New Shipper Reviews and Partial Rescission of Review, 74 Fed. Reg. 6,372, 6,372 (Dep't Commerce Feb. 9, 2009) ("Preliminary Results").  Commerce preliminarily determined that, 1) Orient's refusal to fully participate precluded verification of Orient's separate rate status and therefore Orient would be treated as part of the PRC-wide entity, 2) Orient had failed to cooperate to the best of its abilities, and 3) a dumping margin of 216.01% would be assigned to the PRC-wide entity, including Orient.  Id. at 6,380.  Commerce calculated a dumping margin for Yihua Timber of 124.31%.  Id. at 6,384.

Dream Rooms also filed a separate rate certification.  App. to Br. of Lifestyle Enterprise, Inc., Trade Masters of Texas, Inc., Emerald Home Furnishings, LCC, and Ron's Warehouse Furnishings ("Pl.'s App.") Tab 10, at 4, 16.  Commerce issued a supplemental questionnaire and confirmed through Federal Express that the package had been delivered to Dream Rooms.   Def.'s App. Doc. 446, 475.  Dream Rooms did not respond to the supplemental questionnaire and claimed to have never received it.  Def.'s App. Doc. 549.  Commerce found that Dream Rooms had failed to demonstrate eligibility for a separate rate and assigned it the PRC-wide rate.  Preliminary Results, 74 Fed. Reg. at 6,378; Issues and Decision Memorandum for the Antidumping Duty Administrative Review of Wooden Bedroom Furniture from the People's Republic of China, A-570-890, POR 1/1/07  12/31/07, at 83  85 (Aug. 10, 2009) (Issues and Decision Memorandum"), available at http://ia.ita.doc.gov/frn/summary/prc/E9-19666-1.pdf (last visited Feb. 10, 2011).

In August 2009, Commerce published its Final Results.  Final Results, 74 Fed.

Reg. at 41,374.  Commerce determined Orient had demonstrated both de jure and de facto

independence from government control, recognizing that Commerce had failed to inform Orient

that its failure to fully participate in the review would result in denial of separate rate status.

Issues and Decision Memorandum at 75  88.  Based upon Orient's failure to respond fully to the

AD questionnaire, however, Commerce assigned the PRC-wide rate of 216.01% to Orient based

on adverse facts available ("AFA").  Id. at 87; see 19 U.S.C. § 1677e.  Commerce assigned

Yihua Timber a rate of 29.89%.  Amended Final Results, 74 Fed. Reg. at 55,810.  Commerce

adhered to its determination as to Dream Rooms in the Final Results.  Final Results, 74 Fed. Reg.

at 41,378.

In determining surrogate values,[4] Commerce preliminarily relied upon financial

statements from five Filipino companies: Maitland-Smith Cebu, Inc. ("Maitland-Smith"), Casa

Cebuana, Inc. ("Casa Cebuana"), Las Palmas Furniture, Inc. ("Las Palmas"), Global Classic

Designs, Inc. ("Global Classic"), and Diretso Design Furnitures, Inc. ("Diretso Design").  Def.'s

App. Doc. 480, at 5  8.  Commerce preliminarily determined not to rely on those of Arkane

International Corp. ("Arkane") because the company's financial statements indicated

involvement in mining.  Id. at 6.  Commerce also preliminarily determined not to rely on the

financial statements of Insular Rattan and Native Products Corp. ("Insular Rattan").  Id.  In the

---

[4] Under its NME AD methodology, Commerce calculates normal value ("NV") "on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c).  Surrogate values from market economy ("ME") countries are used as a measure of these costs.  See id.; GPX Int'l Tire Corp. v. United States, 715 F. Supp. 2d 1337, 1347 (CIT 2010) ("GPX III").

Final Results, Commerce relied on financial statements of four additional companies: Giardini

Del Sole Manufacturing and Trading Corporation ("Giardini"), SCT Furniture Corp. ("SCT"),

Las Palmas, and Arkane.  Issues and Decision Memorandum at 33  55.  Commerce made

additional determinations as to surrogate producers' indirect materials and subcontracting

expenses, surrogate producers' changes to work-in-process inventory, reliance on World Trade

Atlas ("WTA") import data for wood inputs and tariff headings for medium density fiberboard to

determine value, valuation of brokerage and handling, sources for data on electricity, use of

regression-based wage rates, and the rejection of constructed export price offset.  See generally,

Issues and Decision Memorandum

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will uphold

Commerce's final determinations in AD duty reviews unless they are "unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I.        Initiation and Selection of Respondents

Orient and Lifestyle allege that Commerce violated its own regulation when it

failed to issue sufficient notice of initiation of review, resulting in the erroneous selection of

Orient as a mandatory respondent.  Pl.'s Mem. of P. & A. in Supp. of Rule 56.2 Mot. or J. on the

Agency R.("Pl.'s Br.") at 20; Intervenor Pl.'s Mem. of Law in Supp. of Mot. for J. on the Agency

R. Pursuant to Rule 56.2 ("Intervenor Pl.'s Br.") at 8.  Plaintiffs request the court void the review

ab initio or remand to Commerce to reconsider its selection of Orient.  Pl.'s Br. at 28; Intervenor

Pl.'s Br. at 17  18.  This claim lacks merit.

Commerce "[w]ill publish the notice of initiation of the review no later than the

last day of the month following the anniversary month," or, in this case, February 29, 2008.[5] [6]

See 19 C.F.R. § 351.221(c)(1)(i) (emphasis added). To obtain relief on their claim, Plaintiffs

must show that a violation took place, that the violation resulting in substantial prejudice to

them, and that the remedy is rescission or a rate adjustment. See P.A.M. S.p.A. v. United States,

463 F.3d 1345, 1349 (Fed. Cir. 2006).

Although Commerce appears to have violated its own regulation by failing to

individually name the companies under review by the applicable deadline,[7] the failure to meet a

---

[5] The statute is silent as to Commerce's obligation to publish notice within a certain period of time: "[T]he administering authority, if a request for such a review has been received and after publication of notice of such review in the Federal Register, shall . . . review and determine . . . , the amount of any antidumping duty." 19 U.S.C. § 1675(a)(1).

[6] Commerce has previously declined to follow its own regulation and instead used a two-step procedure. Initiation of Antidumping and Countervailing Duty Administrative Reviews, Request for Revocation in Part, and Deferral of Administrative Review, 73 Fed. Reg. 16,837, 16,837 (Dep't Commerce Mar. 31, 2008); Notice of Initiation of Administrative Reviews of the Antidumping Duty Orders on Frozen Warmwater Shrimp from the Socialist Republic of Vietnam and the People's Republic of China, 73 Fed. Reg. 18,739, 18,739 (Dep't Commerce Apr. 7, 2008); Initiation of Antidumping and Countervailing Duty Administrative Reviews, 72 Fed. Reg. 14,516, 14,516 (Dep't Commerce Mar. 28, 2007); Notice of Initiation of Administrative Reviews of the Antidumping Duty Orders on Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam and the People's Republic of China, 72 Fed. Reg. 17,095, 17,095 (Dep't Commerce Apr. 6, 2007). Commerce also has declined to provide the earlier notice, publishing notification after its regulatory deadline in the two prior reviews of WBF. Notice of Initiation of Administrative Review of the Antidumping Duty Order on Wooden Bedroom Furniture From the People's Republic of China, 72 Fed. Reg. 10,159, 10,159 (Dep't Commerce Mar. 7, 2007); Notice of Initiation of Administrative Review of the Antidumping Duty Order on Wooden Bedroom Furniture from the People's Republic of China, 71 Fed. Reg. 11,394, 11,394 (Dep't Commerce Mar. 7, 2006).

[7] Because the February Notice failed to "serve[] to notify any interested party that the antidumping rate on goods obtained from exporters named in the notice of initiation for an administrative review may be affected by the outcome of that review," it was not "notice of

(continued...)

procedural requirement does not automatically void the agency's subsequent action.[8]  See Brock

v. Pierce Cnty., 476 U.S. 253, 260 (1986) ("We would be most reluctant to conclude that every

failure of an agency to observe a procedural requirement voids subsequent agency action.");

Kemira Fibres OY v. United States, 61 F.3d 866, 868, 871 (Fed. Cir. 1995) (Commerce's failure

to abide by its own regulatory deadline does not void subsequent agency action).  Here, Plaintiffs

have failed to demonstrate substantial prejudice resulting from failure to follow the regulation

because the regulation is intended to effect notice and all interested parties received notice of the

initiation date and resulting deadlines.  See Transcom, 182 F.3d at 880 (finding that the purpose

of the regulation is to provide parties with notice); Pl.'s App. Tab 15 (notifying Lifestyle that

March 7 was the initiation date); March Notice, 73 Fed. Reg. at 12,387  91 (notifying all parties

of initiation and identifying March 7 as the date from which two deadlines would be measured).

What Orient seeks here is to be free of the review based on its fourth highest sales

volume at the earlier notice date.  Oral Arg. Tr., 17, Nov. 16, 2010.  Commerce's decision to

select just two respondents, however, is not mandated.  Orient could have been and probably

should have been selected as an additional respondent even using sales volume at the earlier

initiation date.[9]  Whatever "prejudice" Orient has suffered in not avoiding a legally permissible

---

[7](...continued)
initiation of [the] review" under the regulation.  See Transcom, 182 F.3d at 880.

[8] Lifestyle cites Elkem for the principle that Commerce may not violate its timing
deadlines.  Pl.'s Br. at 20  21; Elkem Metals, Inc. v. United States, 26 CIT 234, 243 (2002).  In
Elkem, however, the International Trade Commission promised a hearing as a matter of
regulation and then revoked that right.  Elkem, 26 CIT at 243.  Here, in contrast, Commerce
merely delayed its full notification rather than failing to give notice entirely.

[9] See infra note 15.

review, it is not one which the regulation was intended to guard against.

## II.     Separate Rate & AFA Determinations

### A)     Orient's Separate Rate Status

AFMC alleges Commerce properly concluded Orient did not have separate rate status in the Preliminary Results, but erred in granting Orient a separate rate status in the Final Results.  Intervenor Def.'s Rule 56.2 Br. in Supp. of Mot. for J. on the Agency R. ("Intervenor Def.'s Br.") at 35.  This claim lacks merit.

Commerce granted Orient its separate rate status on the basis that Commerce "did not clearly inform Orient . . . of [its] obligation" to otherwise respond to the AD questionnaire.  Issues and Decision Memorandum at 83.  Orient had affirmatively demonstrated an absence of de jure or de facto government control.[10]  Def.'s App. Doc. 151.  Commerce concluded in the Final Results Orient had effectively demonstrated de jure and de facto independence from the government.  Issues and Decision Memorandum at 84.  Whatever the merits of Commerce's reasoning, Orient did not fail to provide information in regard to its separate status.  Orient's failure in other respects does not undermine this showing.  See Gerber Food (Yunnan) Co. v. United States, 387 F. Supp. 2d 1270, 1287 88 (CIT 2005); Shandong Huarong Gen. Grp. Corp. v. United States, 27 CIT 1568, 1594 95 (2003).

---

[10] Commerce presumes state control unless the contrary is demonstrated.  Based on the parties' arguments the court need not resolve here whether the presumption of state control is supported.  See Qingdao Taifa Grp. Co. v. United States, Slip Op. 10-126, 2010 WL 4704464, at *3 (CIT Nov. 12 2010) ("Taifa III").

**B)     Orient's AFA Rate**

As indicated, Orient initially participated in the review, but withdrew the confidential version of its questionnaire response relating to its cost and prices and informed Commerce it would significantly limit its participation in the review after Commerce informed Orient its questionnaire response was deficient.  Def.'s App. Doc. 366, 368, 374.  In the Final Results, Commerce assigned Orient a rate of 216.01% based on adverse facts available ("AFA") due to Orient's failure to respond to Commerce's questionnaire.  Issues and Decision Memorandum at 85  87.  Commerce calculated this rate by choosing the highest company-specific calculated rate from any segment of the proceeding: 216.01% assigned to Shenyang Kunyu Wood Industry Co., Ltd. ("Kunyu") in a prior administrative review.  Issues and Decision Memorandum at 87  88; Wooden Bedroom Furniture from the People's Republic of China: Final Results of the 2004-2005 Semi-Annual New Shipper Reviews, 71 Fed. Reg. 70,739, 70,739 (Dep't Commerce Dec. 6, 2006).  Commerce attempted to corroborate Kunyu's rate as to Orient with the finding "that the margin of 216.01 percent was within the range of margins calculated on the record of the instant administrative review."  Issues and Decision Memorandum at 88.

Commerce found that "[b]ecause the record of this administrative review contains margins within the range of 216.01 percent, . . . the rate from the 2004  2005 review continues to be relevant for use in this administrative review."[11] Id.

Lifestyle and Orient allege that Commerce erred when it assigned Orient the PRC-wide rate of 216.01% as an AFA rate, despite Orient's separate rate status.[12] Pl.'s Br. at 38  39; Intervenor Pl.'s Br. at 16.  Orient and Lifestyle ask the court to assign Orient the rate granted to non-mandatory respondents or, in the alternative, remand this matter to Commerce so that

---

[11] At oral argument, the Government clarified that "[[      ]] transaction specific margins from Yihua Timber during this period of review" were used to corroborate Orient's rate.  Oral Arg. Tr., 42, Nov. 16, 2010.  During the period of review, Yihua Timber exported [[      ]] to the United States.  Mem. in Supp. of Consol. Pl.'s Mot. for J. on the Agency R. Under Rule 56.2 Filed by Guangdong Yihua Timber Indus. Co., Ltd. ("Consol. Pl.'s App.") Tab 1, at 2. The Government has not stated what percentage of Yihua Timber's sales were used to corroborate Orient's rate and what the significance of such a percentage would be.  See Gallant Ocean (Thai.) Co. v. United States, 602 F.3d 1319, 1325 (Fed. Cir. 2010) (holding an AFA rate uncorroborated when Commerce failed to "show that a small percentage of the mandatory respondents' transactions represented a reasonably accurate estimate of [non-participating respondent's] actual dumping margin").

[12] Lifestyle claims that Commerce de facto revoked Orient's separate rate status by assigning Orient the PRC-wide rate.  Pl.'s Br. at 40.  Once a separate rate status determination is made, Commerce may not apply the PRC-wide rate, as such, to an entity.  Qingdao Taifa Grp. Co. v. United States, 637 F. Supp. 2d 1231, 1241 (CIT 2009) ("Taifa II").  Here, Commerce did not assign Orient the PRC-wide rate, but rather the rate from a cooperating company corroborated with data from the current period of review.  Issues and Decision Memorandum at 87  88.  This claim lacks merit as Commerce did not assign the PRC-wide rate per se, but rather selected the same rate based on separate considerations.  Orient shares the same rate as the PRC-wide entity because Commerce applied AFA to both the PRC-wide entity and Orient because neither Orient nor the PRC provided any of the requested production information.  Commerce has in the past calculated the same AFA rate for separate rate respondents and the PRC-wide entity.  See AFMC's Resp. in Opp. to Resp'ts' Rule 56.2 Mot. for J. on the Agency R. ("Intervenor Def.'s Resp. Br.") at 55.  Nonetheless, the leap to use of the PRC-wide rate as a separate AFA rate presents a problem, as explained in the text.

*Confidential Data Deleted*

Commerce may redetermine the AFA rate for Orient.  Intervenor Pl.'s Br. at 18  19; Pl.'s Br. at

41.

   In calculating an AFA rate, Commerce may rely on secondary information, which

includes information derived from the petition, a final determination, or any previous review or

determination.  19 U.S.C. § 1677e(b); 19 C.F.R. § 351.308(c)(1).  Where Commerce uses

"secondary information rather than information obtained in the course of an investigation or

review," it must corroborate that information by demonstrating that it has probative value.  19

U.S.C. § 1677e(c); KYD, Inc. v. United States, 607 F.3d 760, 765 (Fed. Cir. 2010).  Here,

Commerce chose secondary information    a rate from a prior administrative review    and

therefore needed to corroborate that rate.  See Gallant, 602 F.3d at 1325 (recognizing the

statutory requirement that secondary information, such as a petition rate, be corroborated).

   Corroboration demands that Commerce use reliable facts with "some grounding in

commercial reality."[13]  Gallant, 602 F.3d at 1323  24; see F.lli. De Cecco Di Filippo Fara S.

Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (AFA rates must be

reasonably accurate estimates of respondents' rates with some built-in increase as a deterrent for

non-compliance).  Indications that a rate may not reflect commercial reality include significantly

lower rates for cooperating respondents and the presence of more recent, conflicting data.[14]  See

---

[13] Although clearly distinct standards under Federal Circuit precedent, corroboration and reliability seem to collapse together in that they require demonstration of the same facts and legal conclusions.  See, e.g., KYD, 607 F.3d at 766.  Here, Commerce stated it corroborated the rate by using "high-volume transaction-specific margins for cooperative companies which are . . . higher than the . . . [assigned adverse facts available] rate."  Id.; see NSK Ltd. v. United States, 346 F. Supp. 2d 1312, 1335 (CIT 2004).

[14] The Government and AFMC assert that Ta Chen stands for the proposition that a small

(continued...)

Gallant, 602 F.3d at 1324.  As the rate becomes larger and greatly exceeds the rates of cooperating respondents, Commerce must provide a clearer explanation for its choice and ample record support for its determination.  See Taifa III, 2010 WL 4704464, at *5 n.7.

Here, the highest separate rate assigned in the current review to a company other than Orient was 29.89%, which was the rate assigned to eighteen parties.  Final Results, 74 Fed. Reg. at 41,380.  Commerce also assigned a 0% rate to two companies.  Id. at 41,381. Furthermore, Orient had been assessed a significantly lower rate of 7.28% from 2006 until 2008, however it was not individually examined during that period.  Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order/Pursuant to Court Decision: Wooden Bedroom Furniture From the People's Republic of China, 71 Fed. Reg. 67,099, 67,099 (Dep't Commerce Nov. 20, 2006).  Although Commerce did compare Kunyu's 216.01% rate with a large number (in absolute terms) of Yihua Timber's sales, Commerce's total failure to address the dramatic increase in Orient's rate from 7.28% to 216.01%, where the non-PRC-wide rates range from 0% to 30%, raises the concern that "[t]here is little likelihood that in any real world this could be an approximation of an actual rate."  Taifa III, 2010 WL 4704464, at *3.  Orient is at least entitled to an explanation and supporting evidence regarding their 3000%

---

[14](...continued)
percentage of sales can be used to corroborate an AFA rate.  See Def.'s Br. at 37  38; Intervenor Def.'s Resp. Br. at 54, 60  61; Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330 (Fed. Cir. 2002).  "Ta Chen was not a corroboration case as Commerce relied on primary information," Gallant, 602 F.3d at 1324.

increase in margin, which is also 700% greater than the highest separate rate assigned in the

review.[15]  See id. at *5.  The dramatic increase in Orient's rate requires Commerce to present

substantial evidence that the new rate reflects commercial reality.  See Gallant, 602 F.3d at

1324  25.  By not stating what percentage of Yihua Timber's sales were used to corroborate

Orient's rate and the significance thereof nor elaborating on how the new rate was grounded in

commercial reality, Commerce has provided neither substantial evidence nor reasoned

explanation.  Although Orient did not distinguish itself when it withdrew its own data, this is not

a proceeding which is devoid of all data.  Commerce has information on the record which it can

use to come to a reasoned and supported conclusion.  Accordingly, the court remands this matter

to Commerce with instructions to either explain its determination or replace Orient's rate with a

corroborated rate, reflective of commercial reality.

---

[15] [[



]]  This radical growth suggests that the business
model that yielded Orient a 7.28% rate had given way to a more aggressive business model.
Finally, Orient was on notice that Commerce had, in the prior administrative review, assigned
Kunyu's 216.01% rate to a non-participating mandatory respondent.  Wooden Bedroom Furniture
from the People's Republic of China: Final Results of Antidumping Duty Administrative Review
and New Shipper Review, 73 Fed. Reg. 49,162, 49,166 (Dep't Commerce Aug. 20, 2008).  None
of this was discussed by Commerce.

*Confidential Data Deleted*

**C)      Dream Rooms's Separate Rate Status**

Lifestyle alleges that Commerce erred when it assigned the PRC-wide rate to Dream Rooms.  Pl.'s Br. at 41.  Commerce assigned Dream Rooms the PRC-wide rate on the basis that Dream Rooms had failed to reply to the supplemental separate rate questionnaire. Issues and Decision Memorandum at 76; Def.'s App. Doc. 130, 446, 475.  Lifestyle asserts Dream Rooms never received the supplemental questionnaire.  Lifestyle Enter., Inc., Trade Masters of Texas, Inc., Emerald Home Furnishings, LLC and Ron's Warehouse Furniture D/B/A Vineyard Furniture Int'l, LLC Resp. to Mot. for J. on the Agency R. Pursuant to Rule 56.2(c) Filed by the Am. Furniture Manufacturers Comm. for Legal Trade and Vaughan-Bassett Furniture Co., Inc. and Br. in Support Thereof ("Pl.'s Resp. Br.") at 16  17; Def.'s App. Doc. 549.  Unlike prior Commerce cases where lack of receipt was supported, here there was no demonstrated error by Commerce, external explanations, or other proof.[16]  See, e.g., Issues and Decision Memorandum for the Antidumping Duty Administrative Review on Certain Frozen Warmwater Shrimp from India, A-533-840, POR 8/4/04  1/31/06, at 33  35 (Sept. 5, 2007), available at http://ia.ita.doc.gov/frn/summary/india/E7-18006-1.pdf (last visited Feb. 10, 2011) (evidence showing delivery to an unknown address); Issues and Decision Memorandum for the Final Results of the 2006  2007 Antidumping Duty Administrative Review on Silicon Metal from the People's Republic of China, A-570-806, POR 6/01/06  5/31/07, at 4 (Aug. 4, 2008), available at http://ia.ita.doc.gov/frn/summary/prc/E8-18477-1.pdf (last visited Feb. 10, 2011)

---

[16] Lifestyle alleges that Commerce's evidence of receipt is circumstantial.  Pl.'s Resp. Br. at 16  17.  Circumstantial evidence is sufficient to support a factual finding.  Desert Palace, Inc. v. Costa, 539 U.S. 90, 98  99 (2003) (finding circumstantial evidence valid absent a direct statute holding the opposite).

(evidence showed delivery to offices which had been closed by the respondent).  Respondent

cannot rely on an allegation of mailing error without additional proof.  See Uniroyal Marine

Exps. Ltd. v. United States, 626 F. Supp. 2d 1312, 1316 (CIT 2009) (Commerce rejected

respondent's claim that the questionnaire was lost in the mail).  Dream Rooms' sole evidence

that it did not receive the supplemental questionnaire is an affidavit signed by Dream Rooms'

general manager stating that Dream Rooms never received the supplemental questionnaire.  See

Def.'s App. Doc. 549.  In contrast, Commerce presented uncontested evidence that it sent the

supplemental questionnaire to Dream Rooms' mailing address and facsimile number as provided

in Dream Rooms' separate rate application.  Issues and Decision Memorandum at 76; Pl.'s App.

Tab 13.  In the face of such evidence, Dream Rooms needed to present evidence demonstrating

that it in fact never received the supplemental questionnaire, such as a changed address or

facsimile number, that the individual who signed for the package was never employed by the

company, or that the package was improperly delivered.  Commerce may decline to rely on

conclusory affidavits alone as not sufficient.  Here, Commerce weighed the affidavit by Dream

Rooms' general manager against documents demonstrating delivery to an uncontested address

and facsimile number.  Commerce's determination is therefore supported by substantial

evidence.

III.    **Normal Value**

    A)    **Wood Inputs**

        AFMC alleges that Commerce erred because, 1) Commerce failed to adequately

explain why the limited gross weight data from the World Trade Atlas ("WTA") was more

reliable in valuing wood inputs than volume data, including some estimated data, from the

Philippines National Statistics Office ("NSO") data, and 2) Commerce improperly accepted and

relied upon data submitted in Yihua Timber's rebuttal brief denying AFMC the opportunity to

respond.  Intervenor Def.'s Br. at 16  22.  AFMC asks the court to remand the issue to Commerce

for further deliberation on the surrogate value for wood inputs.  Id. at 22.  This claim has merit.[17]

        In the Preliminary Results, Commerce determined the surrogate value for wood

inputs using volume-based NSO data.  Def.'s App. Doc. 480, at 4.  The NSO also reports data in

gross weight in kilograms and freight on board value.  App. to AFMC's Rule 56.2 Br. in Supp. of

Mot. for J. on the Agency R. ("Intervenor Def.'s App.") Tab 14, at Ex. 2.  Yihua Timber

appended to its rebuttal brief before Commerce new data supporting its contention that NSO data

was anomalous.  Id. at Tab 29, at Attach. 1.  In the Final Results, Commerce relied upon data in

Yihua Timber's rebuttal brief in rejecting NSO data.  Issues and Decision Memorandum at 6, 8.

Instead of using the volume NSO data, Commerce used gross weight WTA data, as reported by

gross weight in kilograms, in the Final Results on the basis that "no interested party [had]

---

[17]  The Government contends that AFMC "failed to squarely challenge the reliability of the WTA data during the administrative briefing, even though Yihua Timber specifically contended that Commerce should rely on the WTA data instead of the NSO data [therefore AFMC] failed to avail themselves of the administrative remedy that Commerce provided in its regulation."  Def.'s Br. at 70  71 (internal citations omitted).  First, Commerce seemed to waive its exhaustion claim at oral argument, stating that it was "arguing on the merits."  See Oral Arg. Tr., 76, Nov. 16, 2010.  Second, to exhaust administrative remedies, normally a party usually must submit a case brief "present[ing] all arguments that continue in [its] view to be relevant to [Commerce's] final determination or final results." 19 C.F.R. § 351.309(c)(2); 28 U.S.C. § 2637(d).  A party, however, may seek judicial review of an issue that it did not brief at the administrative level if Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level.  LTV Steel Co. v. United States, 985 F. Supp. 95, 120 (CIT 1997); Taifa II, 637 F. Supp. 2d at 1237 (respondent are "not required to predict that Commerce would accept other parties' arguments and change its decision").  Because Commerce changed its position from the Preliminary Results to the Final Results, AFMC may seek judicial review of its surrogate value claim relating to wood inputs.

claimed that the WTA import data for the Philippines is unreliable." Id.

First, Commerce failed to explain why it chose gross weight data (from the WTA) over volume data (from the NSO). Commerce must explain why volume data are not the superior approach given the patent complications with using gross weight data with wood inputs, such as differences in gross weight between high-moisture green wood imported into the Philippines and kiln-dried wood consumed by Yihua Timber and that different types of packaging of the same wood may result in distortions in the gross-weight data. Intervenor Def.'s Br. at 15, 20  21. Commerce did more than choose between data from the WTA and NSO: It changed the measurement of wood inputs from volume to gross weight without explanation. Differences between the NSO data's net and gross weights fail to explain why the NSO data's volume data is anomalous.[18] [19] Given the essential nature of wood to wooden bedroom furniture

_____

[18] Commerce may not rely on the assumption that because it has determined NSO data to be anomalous therefore it may use WTA data. First, the anomalies were discovered in separate sections of the tariff code, pertaining to nails and adhesives. Issues and Decision Memorandum at 6. Second, Commerce admits that its findings are contingent on highly similar products being packaged using similar containers and materials, an assumption that seems tenuous given the nature of the product. Id. Third, Commerce acknowledges that it has not reached the critical issue of whether the Philippine NSO consistently applies a standard conversion factor to complete missing data fields. Id. Fourth, even if the NSO data is anomalous Commerce has failed to explain why those anomalies would not be present in the WTA data as well. Id. In what is in essence a volume versus gross weight issue, Commerce cannot rely on debunking the NSO data as a rationale for changing the unit of measurement.

[19] The Government counters that, 1) it incorporated Yihua Timber's arguments by reference, and 2) Petitioners offer only unsupported hypotheticals. Def.'s Br. at 68  71. First, Commerce did not incorporate Yihua Timber's arguments by reference. Commerce merely stated that it agreed "with Yihua Timber that numeric anomalies bring into question the reliability of the [NSO] data," that "net weights and corresponding gross weights vary significantly throughout the NSO data," and that "using a net quantity and gross value to calculate surrogate values would be distortive." Issues and Decision Memorandum at 6. Furthermore, Commerce addresses neither the shift from volume-based to weight-based

(continued...)

valuation and Commerce's continued use of NSO volume data in the subsequent administrative review, Commerce must provide substantial support for its shift in both the source of the data itself and the unit of measurement used. See Wooden Bedroom Furniture From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Intent To Rescind Review in Part, 75 Fed. Reg. 5,952, 5,962 (Dep't Commerce Feb. 5, 2010). Commerce did not support its finding that numeric anomalies present in the NSO data are not present in the WTA data or why measuring the input in gross weight is superior to measuring the input by volume.[20]

Second, Commerce, contrary to its normal practice, permitted Yihua Timber to submit data in Yihua Timber's response brief and Commerce relied upon the data in the Final Results. See Issues and Decision Memorandum at 6; 10 C.F.R. § 351.301(b)(2) (setting the deadline for submission of factual information to 140 days after initiation of the administrative review). In such a case, parties must receive a full and fair opportunity to respond, which AFMC will have on remand. See Old Republic Ins. Co. v. United States, 645 F. Supp. 943, 956 (CIT 1986) (granting "full opportunity to respond" where a "substantive challenge to plaintiff's affidavit was not made until defendant's final brief").

---

[19](...continued)
measurements nor the domino effect using supposedly anomalous NSO data would have on WTA data. Commerce's sole comment, that "[Commerce has] already determined that the NSO volume-based data is flawed" and therefore not "less distortive than WTA weight-based data," is a circular argument requiring further evidence or explanation. See Issues and Decision Memorandum at 9. Second, AFMC's hypotheticals are not the basis of a claim but rather an elucidation of Commerce's failure to identify the source of the anomaly.

B)        **Medium Density Fiberboard**

AFMC alleges that Commerce erred because Commerce failed to, 1) use official Philippine Standard Commodity Classification ("PSCC") descriptions of tariff subheadings in lieu of those published by the WTA, and 2) distinguish between 4411.21 and 4411.29, both of which could have been used given Commerce's reasoning.  Intervenor Def.'s Br. at 23  25.  This claim has merit.

In the Preliminary Results, Commerce assigned a surrogate value for medium density fiberboard ("MDF") using WTA tariff heading 4411, generally.  In the Final Results, Commerce assigned the surrogate value for MDF using only WTA tariff heading 4411.29 because the tariff subheading covered densities from 0.5 g/cc to 0.8 g/cc, providing a more precise value for Yihua Timber's MDF which ranged from 0.45 g/cc to 0.88 g/cc.  Issues and Decision Memorandum at 11.  Commerce determined that only one other subheading, 4411.39, covered part of the density range reported by Yihua Timber and, therefore, using subheadings which did not have specific densities "would detract from the accuracy of the calculation." Issues and Decision Memorandum at 11  12.

First, Commerce stated as a basis for its decision to use a single subheading rather than an aggregate of subheadings or the broader tariff heading "would detract from the accuracy of the calculation," Issues and Decision Memorandum at 12.  But this does not explain why the WTA tariff headings    rather than the PSCC tariff headings    were the best available information.  The parties do not contest that the WTA draws its information from the PSCC and, therefore, Commerce must state why it chose not to look at the more detailed subheadings available in the PSCC.  Additionally, Commerce's reasoning relies on the assumption that the

other tariff subheadings do not reference specific densities.  See Issues and Decision

Memorandum at 11  12.  Although this is true with the WTA subheadings, it proves false with

the PSCC subheadings.  The PSCC subheadings provide densities for tariff subheadings: 4411.11

for MDF of more than 0.8 g/cc, 4411.21 for MDF from 0.5 to 0.8 g/cc, and 4411.31 for MDF

from 0.35 to 0.5 g/cc.  Intervenor Def.'s App. Tab 24, at Attach. 2.  Because Commerce's

reasoning does not hold in light of this fact, it must reconsider and redetermine as necessary.

Second, AFMC argues that when Commerce chose to use a subheading rather

than a heading, Commerce failed to explain why it selected "Other" MDF under 4411.29 rather

than "Not mechanically worked or surface covered" MDF under 4411.21.[21]  Intervenor Def.'s Br.

at 24  25.  Commerce's failure to offer any factual basis for its selection of "Other" over "Not

mechanically worked or surface covered" also necessitates that this issue be remanded.

**C)      Brokerage and Handling Charges**

In the Preliminary Results, Commerce valued brokerage and handling (B&H)

charges at 7.86% of the value of exported merchandise based on the Philippine Tariff

Commission's ("PTC") Customs Administrative Order No. 01-2001, using the average of eight

shipment value brackets from zero to 200,000 pesos.[22]  App. to Lifestyle Enter., Inc., Trade

---

[21]   Neither AFMC nor Commerce explain if Yihua Timber's MDF is mechanically worked or surface covered.  Intervenor Def.'s Br. at 24  25; App. to AFMC's Reply in Supp. of Mot. for J. on the Agency R. ("Intervenor Def.'s Reply App.") Tab 8, at 22  23.

[22] In the Preliminary Results, the rates were as follows:

| | |
|---|---|
| Up to 10,000 pesos | 13.00% |
| Over 10,000 pesos to 20,000 pesos | 10.00% |
| Over 20,000 pesos to 30,000 pesos | 9.00% |
| Over 30,000 pesos to 40,000 pesos | 8.25% |
| Over 40,000 pesos to 50,000 pesos | 7.20% |

(continued...)

Masters of Texas, Inc., Emerald Home Furnishings, LCC, and Ron's Warehouse Furniture,

D/B/A Vineyard Furniture Int'l, LLC Resp. to the Mot. for J. on the Agency R. Pursuant to Rule

56.2(c) Filed by the Am. Furniture Manufacturers Comm. for Legal Trade and Vaughan-Bassett

Furniture Co., Inc. and Br. in Supp. Thereof ("Pl.'s Resp. App.") Tab 15, at 8, Attach. 3.  In the

Final Results, Commerce found that it had erred in the Preliminary Results in not applying the

rate for shipments over 200,000 pesos in the PTC's order.  Issues and Decision Memorandum at

28.  Commerce relied on Yihua Timber's high average entry value and used the PTC B&H rate

for shipments valued at over 200,000 pesos, significantly lowering B&H value.[23]  Id.

AFMC alleges that Commerce failed to calculate a value for handling charges at

all because the source of the B&H calculations, the PTC's order, reported only brokerage fees,

thus accounting for the significant drop in B&H to entry value ratio.[24]  Intervenor Def.'s Br. at

---

[22](...continued)

| | | |
|---|---|---|
| Over 50,000 pesos to 60,000 pesos | | 6.67% |
| Over 60,000 pesos to 100,000 pesos | | 4.70% |
| Over 100,000 pesos to 200,000 pesos | | 2.65% |
| | Average Percentage | 7.68% |

Pl.'s Resp. App. Tab 15, at Attach. 3.

[23] In the Final Results, Commerce took the PTC's B&H rate for shipments of over 200,000 pesos (at a conversion rate of 0.02151 peso per USD or $114.06), a flat rate of 5300 (at the same conversion rate or $4,304.20) plus 0.00125 of the shipment value, and applied it to Yihua Timber's average entry value of [[

]]  Intervenor Def.'s App. Tab 33, at Attach. 5.

[24] AFMC offers the World Bank survey, Trading Across Borders in Phillippines, as the only report covering both brokerage and handling charges.  Intervenor Def.'s Br. at 26. Additionally, AFMC submits that Commerce itself acknowledged this in the 2008 administrative
(continued...)

*Confidential Data Deleted*

27. AFMC asks the court to require Commerce to consider an alternate data source, Trading Across Borders in Philippines, which separately reports B&H charges.[25] Intervenor Def.'s Br. at 26 27. The Government and Lifestyle counter that AFMC failed to exhaust its administrative remedies. Def.'s Br. at 75 76; Lifestyle Enter., Inc., Trade Masters of Texas, Inc., Emerald Home Furnishings, LLC and Ron's Warehouse Furniture D/B/A Vineyard Furniture Int'l, LLC - Reply Br. in Supp. of Mot. for J. on the Agency R. Under Rule 56.2 ("Pl.'s Reply Br.") at 34 35. Commerce did not select a new source for calculating B&H charges, but rather used additional data from the same source. Even if AFMC was surprised by the drop in the B&H value, or was just banking on Commerce failing to discover its clear error, it is asking for consideration of an entirely new document, which it did not place before the agency. As a factual matter, this record does not demonstrate that Commerce excluded handling costs or failed to use the best information it had on the record regarding B&H charges. Because AFMC does not challenge Commerce's selection of rates but rather the source itself, AFMC's failure to challenge the use of PTC's order at the administrative level as unreliable and proffer the new data at the administrative level, precludes that option now.

Yihua Timber alleges that Commerce double-counted when it calculated a

---

[24](...continued)
review. Id.; Wooden Bedroom Furniture From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Intent To Rescind Review in Part, 75 Fed. Reg. 5,952, 5,962 (Dep't Commerce Feb. 5, 2010).

[25] The PTC's order does not say "handling" and does mention "brokerage fees" several times. Intervenor Def.'s App. Tab 33, at Attach. 5. Commerce refers to the numbers resulting from the PTC's order as "B&H." Issues and Decision Memorandum at 27 28.

surrogate value for PRC B&H where such charges were included in the ME ocean freight B&H.[26]

Consol. Pl.'s Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Consol. Pl.'s Br.") at

58. This claim lacks merit. Commerce determined that Yihua Timber did not "adequately

demonstrate[] that its B&H was actually provided by an ME supplier." Issues and Decision

Memorandum at 28. Commerce based this finding on Yihua Timber officials' comments that

"foreign shipping companies can only handle ocean transportation, where other services . . . have

to be handled by a local agent." Id. at 28. Furthermore, Commerce found that Yihua Timber

failed to partition the PRC B&H charges from the ME ocean freight charges. Id. at 28. Thus,

Yihua Timber could not demonstrate what double-counting might have been occurring. Further,

given the very low rate of B&H charges in the Final Results it is unlikely that significant double-

counting occurred. Also, Commerce used data provided by the NME producer itself.[27] Id. Thus,

Commerce's choice of a source to value for B&H charges is adequately supported and has not

been demonstrated to be erroneous. Commerce's decision is therefore sustained in this regard.

---

[26] Commerce may use ME values for some factors of production instead of surrogate values if they are separately determinable.

[27] Yihua Timber compares the instant case to Shandong Huarong Mach. Co. v. United States, 31 CIT 1815, 1827 (2007) where the court "sustain[ed] as reasonable . . . Commerce's inference that the surrogate value for brokerage and handling includes the expenses incurred in loading and containerizing the merchandise." Id. Commerce's discretion to extrapolate from incomplete data in one case does not require the court to mandate that Commerce do so in subsequent cases. Magnesium Corp. of Am. v. United States, 166 F.3d 1364, 1372 (Fed. Cir. 1999) (permitting Commerce "broad discretion in valuing the factors of production on which factory overhead is based").

    **D)**    **Electricity**

Commerce selected a surrogate value for electricity from The Cost of Doing Business in Camarines Sur, rejecting Yihua Timber's argument that Commerce should instead use Doing Business in the Philippines. Issues and Decision Memorandum at 22 23. According to Commerce, The Cost of Doing Business in Camarines Sur provides provincial data specific to industrial users of electricity while Doing Business in the Philippines covers a broader geographical area but aggregates residential and commercial customers. Id. at 22.

Yihua Timber alleges that Commerce failed to combine the data sets and use at least some of the data from Doing Business in the Philippines, which provides disaggregated data on industrial electricity usage for one region and business electricity usage for another.[28] Intervenor Pl.'s Br. at 56 57. AFMC asserts that this claim was not exhausted at the administrative level because Yihua Timber failed to raise the claim that Commerce should combine the two data sets rather than merely apply the data from Doing Business in the Philippines. Intervenor Def.'s Resp. Br. at 37. Yihua Timber counters that it did not have the opportunity to raise the issue because Commerce's reasoning    that the use of industrial data took preference over broader geographical coverage    was not articulated until the Final Results. Intervenor Pl.'s Response Br. at 28. Commerce is not required to consider every possible data set combination. Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 28 CIT 1185,

---

[28] Yihua Timber argues Commerce took this approach in the second administrative review, but offers no evidence on record to substantiate this claim. Consol. Pl.'s Br. at 56; Amended Final Results of Antidumping Duty Administrative Review and New Shipper Reviews: Wooden Bedroom Furniture From the People's Republic of China, 72 Fed. Reg. 46,957, 49,957 (Dep't Commerce Aug. 22, 2007). Even if this were the case, Commerce is not bound by previous administrative reviews, so long as it does not act arbitrarily. Cinsa, S.A. de C.V. v. United States, 966 F. Supp. 1230, 1238 (CIT 1997).

1190 (2004) ("Commerce need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was reasonable").  Thus, this choice is likely within Commerce's discretion.  In any case, given that both data sets were on the record and Commerce did not change its methodology from the Preliminary Results to the Final Results, Issues and Decision Memorandum at 22, Yihua Timber could have   but did not   argue for combination of data at the administrative level.  Thus, Yihua Timber also failed to exhaust its claim.

## IV.    Surrogate Financial Ratios

### A)    Admission of Financial Statements

Yihua Timber and AFMC allege that the reliance on financial statements of certain surrogate companies was not supported by substantial evidence.  Consol. Pl.'s Br. at 15; Intervenor Def.'s Br. at 27.  In general, these claims assert that, 1) Dorbest IV did not foreclose arguments based on economies of scale, see Dorbest Ltd. v. United States, 604 F.3d 1363, 1374 (Fed. Cir. 2010) ("Dorbest IV"), 2) a narrative statement of unclear significance related to a non-subject mining operation can be the basis for the rejection of entire financial statements, and 3) the requirement that Commerce must identify producers of comparable merchandise ought to be strictly construed.  Consol. Pl.'s Br. at 15.

#### i.    Economies of Scale

Yihua Timber alleges that Commerce distorted the financial ratio data based on economies of scale because the companies selected, unlike the respondents, were both small in operation and customer base, had a different production process than Yihua Timber, or had

financial ratio data which was aberrational or double-counted significant costs.[29]  Consol. Pl.'s

Reply Br. in Supp. of Its Rule 56.2 Mot. for J. on the Agency R. at 2 ("Consol. Pl.'s Reply Br.");

see Consol. Pl.'s Br. at 15  16.[30]

        In Dorbest IV, the respondent challenged Commerce's use of seven companies

where the larger companies had SG&A ratios of 24.38%, 13.53%, and 10.44% and the smaller

companies had SG&A ratios of 31.51%, 34.39%, 47.30%, and 15.66%.  Dorbest IV, 604 F.3d at

1374.  Like Yihua Timber, respondent's argument was based on the concept that the size of the

companies distorted the SG&A ratio.  Id.  The Federal Circuit found that excluding smaller

companies based on distortions in economies of scale would also necessitate excluding the larger

companies based on economies of scale, thereby impermissibly excluding all data from all

surrogate companies.  Dorbest IV therefore held that Commerce can rely on certain financial

surrogate companies' financial statements even where distortions based on economies of scale

exist without explaining what factor or factors beyond company size determine a company's

SG&A ratio.  See id.  Yihua Timber unconvincingly attempts to distinguish the instant case from

Dorbest IV on the basis that factual proof exists that "[t]here is an unambiguous divide between

---

[29] In order by size: 1) Maitland Smith: Overhead ("OH") Ratio    28.29%; Selling, General, and Administrative Expenses ("SG&A") Ratio    5.23%, 2) Casa Cebuana: OH Ratio 19.33%; SG&A Ratio    10.72%, 3) Giardini: OH Ratio    35.52%; SG&A Ratio    12.35% , 4) Arkane: OH Ratio    7.24%; SG&A Ratio    6.55%, 5) Las Palmas: OH Ratio    31.96; SG&A Ratio    23.60%, 6) SCT: OH Ratio    31.36%; SG&A Ratio    20.27, 7) Global Classic: OH Ratio    74.77%; SG&A Ratio    7.72%, 8) Diretso Design: OH Ratio    16.12%; SG&A Ratio 70.37%.  Issues and Decision Memorandum at 40  41.

[30] Yihua Timber concedes that in light of Dorbest IV, evidence that smaller companies have higher SG&A ratios than larger companies does not by itself require the exclusion of smaller companies.  Consol. Pl.'s Reply Br. at 2; see Dorbest IV, 604 F.3d at 1374.  Yihua Timber contends that Dorbest IV allows for company size as a relevant but not dispositive factor. Consol. Pl.'s Reply Br. at 3.

the aggregate SG&A and overhead ratios of the four smaller and four larger surrogate

companies." Consol. Pl.'s Reply Br. at 5. Yihua Timber's attempt to demonstrate a distortion

based on economies of scale is misplaced because an unambiguous divide between SG&A and

OH ratios does not exist. For example, Global Classics, the seventh of eight companies in terms

of size has the third smallest SG&A ratio. Issues and Decision Memorandum at 41. Even if this

case were distinguishable from Dorbest IV, Commerce provided a reasonable explanation that

economies of scale did not distort the financial ratios because Commerce found no "sufficient

relationship between company size and financial ratios to warrant the exclusion of companies

Yihua Timber has designated as smaller producers." Issues and Decision Memorandum at 40  41

(comparing sales value, OH ratio, and SG&A ratio in determining that no reason to exclude

exists). Commerce, therefore, did not err when it rejected Yihua Timber's contention that the use

of smaller companies distorted the financial ratio data.

### ii. Mining Operations (Arkane)

Commerce concluded that Arkane was a producer of comparable merchandise

because it did not have a significant mining operation. Issues and Decision Memorandum at

42  43; App. to Guangdong Yihua Timber Industry Co., Ltd.'s Reply Br. in Supp. of Its Rule 56.2

Mot. for J. on the Agency R. ("Consol. Pl.'s Reply App.") Tab 10, at Ex. 18. Commerce

identified two conflicting statements in Arkane's financial statements, which referred to Arkane

as, "a family owned corporation principally engaged in the manufacturing of Rattan and wood

furniture for export," and as, "engaged in small scale mining." Issues and Decision

Memorandum at 42. Commerce found the latter statement insignificant because other "record

evidence provides a reasonable basis to conclude that Arkane is, in fact, engaged primarily in the

production of furniture and not mining," relying on the Articles of Incorporation, secondary purposes of the corporation, and the absence of other references to mining in the financial statements. Id. at 42 43.

AFMC alleges Commerce erred when it admitted Arkane's financial statements to calculate surrogate financial ratios because Commerce incorrectly found that Arkane did not have a major mining operation. Intervenor Def.'s Br. at 27 30. In creating surrogate values, Commerce uses data from producers of "comparable merchandise," considering end uses, physical characteristics, and production processes. See Issues and Decision Memorandum for the Final Results of Administrative Review of Certain Cased Pencils from the People's Republic of China, A-570-827, ARP 12/01/1999 11/30/2000, at 14 18 (July 25, 2002), available at http://ia.ita.doc.gov/frn/summary/prc/02-18856-1.pdf (last visited Feb. 10, 2011). Commerce, therefore, was merely obligated to show substantial evidence that Arkane was a significant producer of wooden furniture production. 19 U.S.C. § 1677b(c)(1). In determining Arkane did not engage in significant mining operations, Commerce permissibly chose between two acceptable inconsistent conclusions. See Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966); Issues and Decision Memorandum at 42.

AFMC further alleges that if Arkane did not have a mining operation, Arkane's financial statements were unreliable because of the narrative error. Intervenor Def.'s Br. at 27 30. Where Commerce does not rely upon fundamentally flawed or incomplete financial statements, minor narrative inconsistencies do not tend to render entire financial statements invalid. Compare Issues and Decision Memorandum for the Administrative Review of Chlorinated Isocyanurates from the People's Republic of China, A-570-898 ARP

06/01/2007  05/31/2008, at 11-13 (Dec. 14, 2009), <u>available at</u>

http://ia.ita.doc.gov/frn/summary/prc/E9-29731-1.pdf (last visited Feb. 10, 2011) (accounting

irregularities sufficient to invalidate surrogate companies), <u>with</u> <u>Issues and Decision</u>

<u>Memorandum for the Antidumping Duty Investigation of Certain Frozen Fish Fillets from the</u>

<u>Socialist Republic of Vietnam</u>, A-552-801, at 76  78 (June 16, 2003), <u>available at</u>

http://ia.ita.doc.gov/frn/summary/vietnam/03-15794-1.pdf (last visited Feb. 10, 2011) (articles

questioning the clarity of price data from financial statements do not render the surrogate

companies' statements invalid).  Commerce proffered evidence that the error was narrative,

isolated, and without ramification for the financial data, thereby demonstrating substantial

support for its conclusion.  <u>See</u> <u>Issues and Decision Memorandum</u> at 42.

### iii.    Comparable Merchandise (Diretso/Palmas/SCT)

Commerce determined that Diretso Design produced comparable wooden

furniture to Yihua Timber and, therefore, Diretso Design's financial statements were sufficiently

specific.  <u>Issues and Decision Memorandum</u> at 43.  In doing so, it relied on website printouts of

www.diretso.com to determine that the products were comparable.  <u>Id.</u>  Yihua Timber alleges

that Commerce confused two distinct companies, Diretso Design and Diretso Trading, and

thereby subjected Yihua Timber to an aberrationally high SG&A rate of 70.37%.  Consol. Pl.'s

Br. at 22.  Yihua Timber bases its claim on website printouts that describe "Diretso Trading"

then show images of www.diretso.com, a website which does not identify itself as belonging to

either Diretso Trading or Diretso Design.  <u>Id.</u> at 23; Def.'s App. Doc. 431, at Attach. 6.  Yihua

Timber's contention before Commerce was that the evidence, "<u>is not a description of Diretso</u>

<u>Design, but rather, of Diretso Trading (perhaps a Sister Company)</u>."  <u>See</u> Def.'s App. Doc. 559,

at 34. Commerce did not respond to this comment in the Final Results and therefore does not provide substantial evidence to support its use of Diretso Design. See Issues and Decision Memorandum at 43.[31]

In the alternative, Yihua Timber alleges that the evidence on the record does not support the conclusion that the Diretso identified by Commerce produces comparable wooden furniture. Consol. Pl.'s Br. at 24. Commerce relied on the website printouts as evidence that Diretso Design produces comparable merchandise, demonstrating that Diretso Design produced sofas, chairs, tables, and accessories.[32] Issues and Decision Memorandum at 43. Yihua Timber produces substantially comparable merchandise: wooden chairs, tables, bookcases, and bedroom furniture. The websites used by Commerce constitute substantial evidence that the company described therein produces comparable merchandise to respondent. The matter is remanded so that Commerce may determine if the financial statements match the correct company.

Yihua Timber alleges Commerce improperly selected Las Palmas because Commerce failed to provide substantial evidence explaining Las Palmas's extensive sales operation as well as its retail aspect. Consol. Pl.'s Br. at 25 26. Commerce concurs that Las Palmas sells furniture at both retail and wholesale and has a large sales operation, but contends

---

[31] On brief, the Government argues that Commerce did not rely on website documents alone, but rather on auditor's notes accompanying Diretso Design's financial statement that the company's core "activity is manufacturing furniture and furniture accessories," and that these descriptions accord with the website printouts. See Def.'s Br. at 49; Issues and Decision Memorandum at 43; Def.'s App. Doc. 431, at Attach. 6; Consol. Pl.'s Reply App. Tab 9. Nevertheless, this rationale was not articulated at the administrative level.

[32] Yihua Timber further contends that the website images are not necessarily Diretso Design, but possibly belonging to Diretso Trading. Consol. Pl.'s Br. at 50. Yihua Timber, however, submitted the same website images into evidence as representations of Diretso Design's catalogue. Consol. Pl.'s Reply App. Tab 12.

that the sales operations and retail presence need not be explained because surrogate data on companies need only reflect the general merchandise and production experience of the respondent companies. Issues and Decision Memorandum at 43  44. Commerce cannot base its analysis on mere speculation, but may draw reasonable inferences from the record. Hebei Metals, 28 CIT at 1203. Commerce examined the financial statements, concluding sufficient data existed for Commerce to calculate surrogate overhead, SG&A and profit ratios, especially in light of the fact that Yihua Timber itself produces more than WBF. Issues and Decision Memorandum at 44. Commerce cites to printouts of Las Palmas's website showing wooden furniture and stating that Las Palmas produces wooden furniture as well as quotes notes to Las Palmas's financial statements, stating that Las Palmas's "primary purpose is to engage in the business of manufacturing goods such as furniture." Id. at 44; App. to AFMC's Response in Opp. to Resp'ts. Rule 56.2 Mots. for J. on the Agency R. ("Intervenor Def.'s Resp. App.") Tab 13, at Ex. 6. Commerce, therefore, provided sufficient evidence that Las Palmas produced comparable merchandise.

Yihua Timber alleges that SCT, like Diretso Design and Las Palmas, is not operationally similar to Yihua Timber and does not produce comparable merchandise because SCT, 1) does not produce a significant amount of wooden furniture, 2) sells to retail businesses as opposed to contract orders at the wholesale level therefore having a different marketing and advertising operation, and 3) produces dining room and living room furnishings. Consol. Pl.'s Br. at 28. First, Commerce correctly relied on evidence in the record that SCT produces wooden

furniture.[33]  Issues and Decision Memorandum at 45; Consol. Pl.'s Reply App. Tab 9, at Attach.

6.  Second, with regard to Yihua Timber's claim that SCT supplies retail businesses, it is unclear

what Yihua Timber seeks to achieve by distinguishing between a company that sells to retail and

one which sells to wholesale.  Indeed, here this appears to be a distinction without difference.

Even if the distinction is meaningful, Commerce cross-references its earlier arguments, stating

that it disagrees with Yihua Timber's arguments, "for the same reasons as discussed above with

respect to Diretso Design and Las Palmas."  Issues and Decision Memorandum at 45.  In the

discussion of Las Palmas, Commerce asserted that Yihua Timber had failed to provide evidence

that Yihua Timber itself sells or does not sell to retail businesses and that expenses derived from

selling retail also apply to sales at the wholesale level.  Id. at 43; Consol. Pl.'s Reply App. Tab 9,

at Attach. 6.  Absent evidence distinguishing either SCT or Las Palmas from Yihua Timber,

Commerce reasonably relied on the evidence in the record to conclude that the companies sold

comparable merchandise with similar marketing expenses.  See Consol. Pl.'s Reply App. Tab 9,

at Attach. 6.  Third, Yihua Timber's argument that SCT produces non-WBF is irrelevant as

Yihua Timber also produces non-WBF.  Furthermore, the comparable merchandise in question is

not WBF, but wooden furniture generally.  See Oral Arg. Tr., 27, Nov. 16, 2010.  Therefore

Commerce's determination that SCT's financial statements were reliable as SCT produced

---

[33] Yihua Timber does not dispute that SCT produces wooden furniture.  See Consol. Pl.'s Br. at 29  30.  The record shows that SCT produces wood, iron, and rattan furniture.  See Consol. Pl.'s Reply App. Tab 9, at Attach. 6.  Instead, Yihua Timber contests that Commerce has not demonstrated that a sufficient percentage of SCT's production of wooden furniture to provide substantial evidence that SCT produces comparable merchandise.  Consol. Pl.'s Br. at 30.  Based on the catalogues, financial records, and descriptions of SCT, Commerce reasonably concluded that SCT's production experience was similar to Yihua Timber's.  See Issues and Decision Memorandum at 45.

comparable merchandise through similar operations was supported.

Yihua Timber alleges that Commerce's reliance on Global Classic's financial statements was impermissible because Global Classic does not have a comparable production process. Consol. Pl.'s Br. at 30 31. Yihua Timber asks the court to reject Commerce's use of Global Classic's financial statements. Commerce included Global Classic's contracting expenses as factory overhead cost, leading to a 74.77% overhead ratio, more than twice the other surrogate companies. See Issues and Decision Memorandum at 40 41. Global Classic's contracting expenses are 53% of its materials, labor, and energy ("MLE"). Consol. Pl.'s Br. at 31. Global Classic's data does not indicate if labor is contracted out. In contrast, Yihua Timber does not use contractors at all in its production process. Consol. Pl.'s App. Tab 3, at 10. Although, as the Government claims, Commerce need not "duplicate the exact production experience," in determining the production experience of the NME respondent, Nation Ford Chem. Co. v. United States, 166 F.3d 1377, (Fed. Cir. 1999), Commerce must select surrogate companies that engage in a comparable production process. See Shanghai Foreign Trade Enters. Co. v. United States, 318 F. Supp. 2d 1339, 1348 (CIT 2004). As indicated, the record does not indicate whether Global Classic's contracts are for materials and energy or for labor if the contracts were for the latter Global Classic would have a fundamentally different production process. Commerce need not exclude every company with an outlying factory overhead ratio or SG&A ratio, however, significant statistical outliers require that Commerce provide an explanation as to how the company maintains a comparable production process. In this case the contrasting experiences cast considerable doubt on the comparability of the production processes. The inflated SG&A ratio requires an explanation that Commerce failed to provide. Commerce

must explain or exclude Global Classic from the calculation.

### B)      Rejection of Financial Statements

In the Final Results, Commerce rejected data from Insular Rattan on the basis that such data were incomplete according to the Philippines' Statement of Financial Accounting Standards ("SFAS") because the record contained a tax return but not the notes or accounting policies. Issues and Decision Memorandum at 35.

Yihua Timber alleges that data on the record were complete and reliable because Commerce misread the record to include a requirement that the record contain not only tax returns but also notes and accounting policies. See Consol. Pl.'s Br. at 33. Yihua Timber's argues that Commerce had the same evidence before it in the second administrative review and decided to rely on Insular Rattan's financial statements. See id. at 32 33. In this case, as opposed to the second administrative review, new facts were placed on the record regarding the Philippine requirement for notes to financial statements. Issues and Decision Memorandum at 35. The SFAS policies placed on the record in this review support Commerce's assertion that the SFAS considers notes and accounting policies an integral part of complete financial records. Intervenor Def.'s Resp. App. Tab 12. Commerce was apparently unaware of this policy during the second administrative review and therefore relied upon Insular Rattan's documents. The new requirements placed on the record in this review constitute new factual information, thus invalidating Yihua Timber's reliance on the second administrative review. See Consol. Pl.'s Br. at 33; Hussey Copper, Ltd. v. United States, 834 F. Supp. 413, 418 19 (CIT 1993) (Commerce may diverge from its methodology or prior determinations so long as it provides reasoned explanations demonstrating it is not acting arbitrarily). Commerce may reject financial

statements where they are not complete, for example, lacking in auditors' notes. Shanghai

Eswell Enter. Co. v. United States, Slip Op. 07-138, 2007 WL 2932873, at *4 (CIT 2007).

Commerce's decision to reject the data from Insular Ratan is supported.

      **C)**      **Ratio Calculations**

            **i.**      **Factory Overhead**

Yihua Timber alleges that Commerce double-counted by including surrogate

companies' indirect materials and indirect labor in factory overhead while requiring Yihua

Timber to report indirect materials and indirect labor as MLE. Consol. Pl.'s Br. at 34 35. Yihua

Timber asks the court to remand so that Commerce can disqualify higher ratio companies as

dissimilar producers of comparable merchandise or realign the factory overhead and MLE of

surrogate companies with Yihua Timber's. Consol. Pl.'s Br. at 41. This claim lacks merit.

Commerce found that Yihua Timber had failed to provide a line-item analysis of

its indirect materials. Issues and Decision Memorandum at 53. Additionally, Commerce

determined that, "each of the surrogate companies has a distinct line-item for labor, as well as

energy and materials," and therefore found "no evidence that direct material, labor, or energy

costs are included in the subcontracting expenses line-items." Id. at 56. Once Commerce selects

surrogate companies, Commerce has some discretion in valuing NME overhead, "[a]s factory

overhead is composed of many different elements, the cost for individual items may depend

largely on the accounting method used by the particular factory." Magnesium Corp. of Am., 166

F.3d at 1372; see GPX III, 715 F. Supp. 2d at 1353. The court has previously affirmed the

methodology used in the instant case. See Shanghai Foreign Trade, 318 F. Supp. 2d at 1341;

Hebei Metals & Minerals Imp. & Exp., 366 F. Supp. 2d 1264, 1277 n.7 (CIT 2005). Commerce

has no requirement "to do an item-by-item analysis in calculating factory overhead." Magnesium

Corp. of Am., 166 F.3d at 1372.[34]  Where the record contains an itemized financial statements for

both the surrogate and the respondent, Commerce will likely be required to make a more detailed

analysis.  Yihua Timber has failed to prove the availability of such evidence.

### ii.      Work-in-Process

Yihua Timber alleges Commerce erred when it treated "period changes in the

value of work-in-process and/or finished goods inventory in addition to, or subtracted from, the

surrogate producer's cost of materials," because accounting in the Philippines, "assigns the costs

of both MLE and factory overhead costs to work-in-process and finished inventory."  Consol.

Pl.'s Br. at 46  47.  Yihua Timber proposes that "factory overhead ratios should have been

calculated by reference to the ratio of the value and factory overhead component of total

manufacturing costs (adjusted for any excluded items) as a percentage of MLE component of

total manufacturing costs (also adjusted for any excluded items)."  Id. at 47.  The court has

upheld Commerce's practice of treating work-in-process changes as direct materials costs unless

the financial statements indicate that other expenses are included in the work-in-process changes.

See GPX III, 715 F. Supp. 2d at 1352; Issues and Decision Memorandum at 48; Antidumping

Duty Administrative for the Final Results of Antidumping Duty Administrative and New Shipper

Reviews of Wooden Bedroom Furniture from the People's Republic of China, A-570-896, POR

---

[34] Yihua Timber argues that it submitted itemized data on Maitland-Smith's production supplies.  Consol. Pl.'s Br. at 39; Consol. Pl.'s Reply App. Tab 18.  Commerce disregarded the data as unverified.  Issues and Decision Memorandum at 54.  Additionally, statements by a Filipino professor on classification were disregarded as not related to specific financial statements.  Id.  Yihua Timber's contention that double-counting occurred confuses the process by which a surrogate financial ratio is created with the act of calculating Yihua Timber's expenses twice.

04/1/06  3/31/07, at 47  48 (Aug. 10, 2008), available at

http://ia.ita.doc.gov/frn/summary/PRC/E8-19303-1.pdf (last visited Feb. 10, 2011).  Such a

determination is reasonable because it reflects actual materials used in production.  See, e.g.,

Final Results and Partial Termination of Antidumping Duty Administrative Review of Tapered

Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of

China, 62 Fed. Reg. 6,173, 6,182 (Dep't Commerce Feb. 11, 1997).[35]

Yihua Timber further alleges that Commerce erred in not deducting Maitland-

Smith's exchange rate gain from SG&A expenses, thus overstating Maitland-Smith's financial

ratios.  Consol. Pl.'s Br. at 47  48.  Yihua Timber provides no citation    indeed because no

citation exists in this record    that this is common practice, as it alleges.  Furthermore, Yihua

Timber raised this issue for the first time on rebuttal, thus likely failing to exhaust administrative

remedies.  See Dorbest IV, 604 F.3d at 1375  76.

**D)      Constructed Export Price Offset**

Yihua Timber alleges that Commerce failed to reduce normal value whenever

normal value "constitutes a more advanced stage of distribution than the level of trade of the

constructed export price," 19 U.S.C. § 1677b(7)(B), because Yihua Timber's constructed export

price, i.e. the U.S. price, is at a level of trade involving no significant selling expenses whereas

several of the surrogate companies used for determining normal value are smaller design shops

selling at retail.  Consol. Pl.'s Br. at 48; see also 19 U.S.C. § 1677b(a)(7)(B).  Commerce has

---

[35] Although normal practice may give way when evidence compels appropriate adjustments, nothing on the record suggests that Commerce was compelled to adjust its findings as Yihua Timber offers no citations to the record demonstrating that its own financial statements are itemized to allow for this type of analysis.  See Rhodia Inc. v. United States, 240 F. Supp. 2d 1247, 1250  51 (CIT 2002).

discretion not to apply a constructed export price offset where it cannot accurately determine the specific indirect selling expenses incurred on sales reflected in the surrogate financial statements because "the plain language of the statute" permits Commerce "the discretion to determine what other expenses will be included in its calculation of NV in an NME." GPX III, 715 F. Supp. 2d at 1348 49; see GPX Int'l Tire Corp. v. United States, 645 F. Supp. 2d 1231, 1246 n.14 (CIT 2009) (Because of the lack of detailed surrogate information, Commerce need not make "fine-tuned adjustments" to NV such as constructed export price offsets). Here, Commerce found that Yihua Timber failed to submit adequate evidence concerning its selling functions and the selling functions of the surrogate companies. Issues and Decision Memorandum at 58 59. To date, Yihua Timber has failed to submit data concerning its own selling functions. Def.'s Br. at 80. Commerce, therefore, did not err in determining that it need not apply a constructed export price offset in calculating normal value.[36]

## V.       Surrogate Labor Value

Commerce requests a voluntary remand to redetermine the surrogate value for Yihua Timber's labor costs in light of Dorbest IV.[37] Def.'s Br. at 77. The Federal Circuit has concluded that Commerce's wage rate regression methodology is inconsistent with 19 U.S.C. § 1677b(c)(4); Dorbest IV, 604 F.3d at 1372 73. In the Final Results, Commerce relied on the

---

[36] Yihua Timber claims that the court's holdings in Dorbest apply. Consol. Pl.'s Br. at 48 (citing Dorbest Ltd. v. United States, 547 F. Supp. 2d 1321, 1338 44 (CIT 2008) ("Dorbest II"); Dorbest Ltd. v. United States, 462 F. Supp. 2d 1262, 1306 (CIT 2006) ("Dorbest I")). The court has already rejected the particular interpretation of Dorbest on which Yihua Timber relies. See supra at 28.

[37] AFMC contends that the court should not remand because a petition for en banc review will be filed with the Federal Circuit. Intervenor Def.'s Resp. Br. at 75 76. No such petition was ever filed.

now invalidated methodology.  Issues and Decision Memorandum at 17 21.  Thus, Commerce

erred in its use of the methodology and the issue will be remanded to Commerce.  See SKF USA

Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (permitting the reviewing court to

grant a voluntary remand in its discretion so long as it is not frivolous or in bad faith).

## VI.    Negative Net U.S. Price

AFMC alleges that in the Final Results Commerce erroneously compared normal

value to U.S. sales price without properly accounting for statutory deductions where the

deductions resulted in a negative value for U.S. price.[38]  Intervenor Def.'s Br. at 31 32;

Intervenor Def.'s App. Tab 33, at 8.  Commerce does not admit error but asks for a remand

because the parties did not have an opportunity to comment.  As this matter is remanded for

many other matters and the parties and Commerce were not in a position to address this issue it is

appropriate to grant Commerce's request for a voluntary remand so that it may correct its error if

there is one or explain its methodology.[39]

---

[38] In actuality, Commerce said where the deductions resulted in a negative number for net
U.S. price it substituted absolute value, i.e. a positive number.  If Commerce actually did this, it
is totally arbitrary.

[39] Lifestyle alleges that AFMC failed to exhausted administrative remedies and therefore
this issue should not be remanded to Commerce.  Pl.'s Resp. Br. at 44 45.  This assertion lacks
merit because, 1) the action was intentional and could not be corrected as a ministerial error after
the Final Results, and 2) AFMC did not have a chance to object earlier because the error was
made in the Final Results.  As AFMC did not have a chance to respond to the error, its claim is
not barred for failing to exhaust administrative remedies.  Taifa II, 637 F. Supp. 2d at 1236.

## VII.    Combination Rates[40]

AFMC alleges Commerce erred when it declined to impose combination rates on exporters and their producers and suppliers. Intervenor Def.'s Br. at 44. AFMC bases its allegation on an article from Furniture Today which it placed in the record.[41] Intervenor Def.'s Br. at 53. Commerce declined to investigate or impose combination rates on the basis that, unlike prior determinations where Commerce had imposed combination rates, "there is no record evidence concerning specific producers who are shifting their exports from high-margin to low-margin exporters, or that specific producers are otherwise manipulating or evading the AD rates. Issues and Decision Memorandum at 71; see Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain In-Shell Raw Pistachios from Iran, A-507-502, POR 07/01/02  06/30/03, at 17 (Feb. 7, 2005), available at http://ia.ita.doc.gov/frn/summary/iran/E5-596-1.pdf (last visited Feb. 10, 2011). Commerce disregarded the article, the only evidence on record, as "too vague to compel the Department to query the entire group of separate rate respondents," because the article cited unnamed officials

---

[40] Commerce "may establish" a combination cash deposit rate for the combination of the exporter and its supplier when a company exports a product to the United States that it did not produce itself. 19 C.F.R. § 351.107. In 2005, Commerce stated that for all future investigations Commerce would apply a single cash deposit rate to the exporter firm and all producers who supplied the same merchandise during the period of investigation. See Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries (Apr. 5, 2005), ("Policy Bulletin 05.1") available at http://ia.ita.doc.gov/policy/bull05-1.pdf (last visited Feb. 10, 2011). The policy does not reference administrative reviews as opposed to investigations.

[41] [[

]]

*Confidential Data Deleted*

and that the article itself was insufficient evidence.  Issues and Decision Memorandum at 71.

AFMC's claim lacks merit.

         Commerce has a duty to prevent circumvention of AD law and may do so by

imposing combination rates.[42]  See Shandong Huarong Gen. Grp., 27 CIT at 1580; 19 C.F.R. §

351.107(b)(1); Tung Mung v. United States, 354 F.3d 1371, 1381 (Fed. Cir. 2004) (Commerce

has the discretion to apply combination rates); Tianjin Magnesium Int'l Co. v. United States, 722

F. Supp. 2d 1322, 1340  41 (CIT 2010) (Commerce generally refrains from issuing combination

rates and combination rates "remain[] solely in the discretion of Commerce"); U.S. Magnesium

LLC v. United States, Slip Op. 07-99, 2007 WL 1875662, *4 (CIT 2007) ("Commerce has broad

discretion . . . [and is not required to] use combination cash deposit rates in administrative

reviews").  Here, the record does not show that Commerce was presented with such a clear case

of circumvention or some other circumstance that would mandate the use of combination rates.

Commerce evaluated AFMC's claims and found that the evidence on the record as a whole did

not substantiate the claims.  Issues and Decision Memorandum at 71.  Commerce, therefore, did

not abuse its discretion in failing to utilize combination rates.

---

[42] AFMC cites Policy Bulletin 05.1 for the proposition that Commerce requires the imposition of combination rates.  Intervenor Def.'s Br. at 49.  The policy bulletin discusses how the rates are imposed, but does not necessarily state that they must be imposed in every NME investigation.  See Policy Bulletin 05.1; see also Policy Bulletin 03.2: Combination Rates in New Shipper Reviews (Mar. 3, 2004), available at http://ia.ita.doc.gov/policy/bull03-2.html (last visited Feb. 10, 2011) (outlining the policies for implementation of combination rates where the system is being circumvented).

## CONCLUSION

For all the foregoing reasons, the court remands the matter for Commerce to explain or otherwise resolve Orient's separate rate, the data set for wood inputs, the tariff heading for medium density fiberboard, whether Diretso and Global Classic produce comparable merchandise through a comparable production process, surrogate labor value, and negative export pricing. The plaintiffs', consolidated plaintiffs', intervenor plaintiff's, and intervenor defendant's motions for judgment on the agency record are otherwise denied.

Commerce shall file its remand determination with the court within 90 days of this date. The parties have 30 days thereafter to file objections, and the Government will have 15 days thereafter to file its response.

    /s/ Jane A. Restani    
Jane A. Restani
Judge

Dated: This 11th day of February, 2011.
    New York, New York.

**ERRATA**

Please make the following change to <u>Lifestyle Enter., Inc. v. United States</u>, No. 09-00378, Slip Op. 11-16:

- page 20, footnote 20: "[Footnote 20 was intentionally left blank.]"

February 28, 2011.