# United States Court of Appeals
# for the Federal Circuit

_____

**LIFESTYLE ENTERPRISE, INC.,**
*Plaintiff,*

AND

**TRADE MASTERS OF TEXAS, INC.,
EMERALD HOME FURNISHINGS, LLC,** AND **RONS
WAREHOUSE FURNITURE (doing business as
Vineyard Furniture International LLC),**
*Plaintiffs,*

AND

**DREAM ROOMS FURNITURE (Shanghai) CO.,
LTD.,**
*Plaintiff,*

AND

**ORIENT INTERNATIONAL HOLDING SHANGHAI
FOREIGN TRADE CO., LTD.,**
*Plaintiff,*

AND

**GUANGDONG YIHUA TIMBER INDUSTRY CO.,
LTD.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**

*Defendant-Appellee,*

**v.**

**AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE AND VAUGHAN-BASSETT FURNITURE COMPANY, INC.,**
*Defendants-Cross Appellants.*

———————————

2013-1323, -1331

———————————

Appeals from the United States Court of International Trade in Nos. 09-CV-0378, 09-CV-0379, 09-CV-0394, 09-CV-0395, 09-CV-0398, and 09-CV-0399, Judge Jane A. Restani.

———————————

Decided: June 2, 2014

———————————

THOMAS M. BELINE, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were JOHN D. GREENWALD and JONATHAN M. ZIELINSKI.

STEPHEN C. TOSINI, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were STUART F. DELERY, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director. Of counsel were REBECCA CANTU and SHANA ANN HOFSTETTER, attorneys, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

J. MICHAEL TAYLOR, King & Spalding LLP, of Washington, DC, argued for defendants-cross appellants. With him on the brief were JOSEPH W. DORN and DANIEL L. SCHNEIDERMAN. Of counsel was PRENTISS LEE SMITH, JR.

_____

Before RADER[*], LINN, and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge.*

Guangdong Yihua Timber Industry Co., Ltd. (Yihua), appeals a final judgment of the Court of International Trade that sustained the latest results (following three previous remands) reached by the United States Department of Commerce in a review of antidumping duties imposed on wooden bedroom furniture imported from the People's Republic of China. The American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Company, Inc. (together, AFMC), cross-appeal. For the reasons set out below, we affirm in part, reverse in part, and remand.

BACKGROUND

In 2005, Commerce issued an order imposing anti-dumping duties on wooden bedroom furniture from the People's Republic of China. Wooden Bedroom Furniture from the People's Republic of China, 70 Fed. Reg. 329 (Dep't Commerce Jan. 4, 2005). On March 7, 2008, acting under 19 U.S.C. § 1675(a), Commerce initiated its third administrative review of the duties. Wooden Bedroom Furniture from the People's Republic of China, 73 Fed. Reg. 12,387 (Dep't Commerce Mar. 7, 2008) (notice of administrative review). The review covered imports during 2007. Commerce published its preliminary results on February 9, 2009. Wooden Bedroom Furniture from

_____

[*] Randall R. Rader vacated the position of Chief Judge on May 30, 2014.

the People's Republic of China, 74 Fed. Reg. 6,372 (Dep't Commerce Feb. 9, 2009) (preliminary results).

As authorized by the statute in the case of China, Commerce, in calculating dumping margins, sought to estimate production costs of the merchandise at issue by using surrogate values from a comparable market economy. 19 U.S.C. § 1675(a)(2)(A)(i) (in review of antidumping duty, Commerce must determine normal value of the merchandise at issue); 19 U.S.C. § 1677b(c)(1) (for a nonmarket economy country, Commerce may determine normal value based on factors of production in a comparable market economy country). In its preliminary results, Commerce determined the value for wood inputs into the furniture, including lumber, by using data from the Philippines National Statistics Office (NSO), which listed imports of wood into the Philippines by volume (in cubic decimeters) and value, resulting in dollars-per-volume-unit figures for various kinds of wood. Preliminary Results, 74 Fed. Reg. at 6,383. Commerce relied on financial statements from five Philippine companies, including Diretso Design Furniture, Inc., to determine values for overhead, for selling, general, and administrative expenses, and for profit. *Id.* at 6,384.

Yihua, a Chinese company that manufactures wooden furniture imported into the United States, filed comments on the preliminary results, challenging Commerce's reliance on the NSO's volume-based data and on Diretso Design's financial statements. With respect to the NSO's volume-based data for wood inputs, Yihua contended that certain anomalies rendered the data unreliable, and it proposed that Commerce use data on imports into the Philippines available from the World Trade Atlas (WTA), which gave weight-based (per-kilogram) figures. With respect to Diretso Design, Yihua contended that there were multiple "Diretso" entities and that the Diretso company whose financial statements Commerce used was

not the same company as the Diretso company that Commerce found to be comparable to Yihua.

In its Final Results, Commerce agreed with Yihua regarding the wood-input issue but not the Diretso issue. Wooden Bedroom Furniture from the People's Republic of China, 74 Fed. Reg. 41,374 (Dep't Commerce Aug. 17, 2009) (final results), amended by 74 Fed. Reg. 55,810 (Oct. 29, 2009). Commerce agreed with Yihua that the NSO's volume-based figures were unreliable, and it adopted the WTA's weight-based figures in their place. Final Results, 74 Fed. Reg. at 41,377; Wooden Bedroom Furniture from the People's Republic of China, Issue and Decision Memorandum for the Final Results of the 2007 Antidumping Duty Administrative and New Shipper Reviews, 5-8 (Dep't Commerce Aug. 10, 2009). As to Diretso, Commerce relied on the financial statements of the same five companies it had used for the preliminary results (including Diretso Design), but also included the financial statements of three additional companies. Final Results, 74 Fed. Reg. at 41,377.

Interested parties brought six separate challenges in the Trade Court, which consolidated them for convenience. *Lifestyle Enter., Inc. v. United States*, Case No. 09-378 (Ct. Int'l Trade Nov. 9, 2009) (ECF No. 34) (consolidation order). Upon plaintiffs' and defendants' motions for judgment on the agency record, the Trade Court remanded the case for Commerce to explain why it used the WTA's weight-based data, rather than the NSO's volume-based data, citing "patent complications with using gross weight data with wood inputs." *Lifestyle Enter., Inc. v. United States*, 768 F. Supp. 2d 1286, 1301 (Ct. Int'l Trade 2011) (*Lifestyle I*). The Trade Court also directed Commerce to redetermine on remand whether the financial statements of Diretso Design were from the correct company. *Id.* at 1308.

On remand, in its First Redetermination results, Commerce continued use of the WTA's weight-based data, as in the Final Results, but discontinued use of Diretso Design's financial statements. Final Results of Redetermination Pursuant to Remand, 8, 18 (Dep't Commerce Aug. 26, 2011) (ECF No. 132). Commerce explained that it found the NSO's volume-based import data to be unreliable because importers (into the Philippines) were required to report weight and value, but not necessarily volume, and when an importer did not report volume, the Philippine NSO filled in a volume figure using a standard conversion factor (a number stated with three decimal places) based on an assumed wood density of 848 kilograms per cubic meter. *Id.* at 10-11. Commerce found that "the record demonstrate[d] that a significant portion of [the volume-based] data were based on standard conversions from gross weight data . . . regardless of the fact that they cover different types of wood." *Id.* Commerce observed that "the same conversion was used in . . . more than 38 percent of the relevant transactions" and found it "highly unlikely that actual conversions would be the same to three decimal points for different types of wood imported from different countries." *Id.* Commerce also found that the assumed density of 848 kilograms per cubic meter significantly exceeded the densities of the wood that Yihua Timber used. *Id.* at 11.

Although Commerce acknowledged that the weight-based figures were also imperfect for valuing the lumber inputs, Commerce found the weight-based data to be more reliable for the veneer and plywood inputs, and it found some value in using a consistent data source for all the wood inputs (veneer, plywood, and lumber). Accordingly, Commerce decided to maintain its reliance on the weight-based WTA data for valuing all the wood inputs, including lumber. Commerce also decided to reverse its original decision regarding the use of Diretso Design's financial

statements; it excluded those statements from the surrogate financial ratio calculations.

On review, the Trade Court found that "the record clearly demonstrates that the use of weight-based data understates the wood input surrogate value" because the "low-moisture, kiln-dried wood" Yihua uses would "command a higher price per kilogram" and "yield[] more cubic meters of wood per kilogram" than higher-moisture green wood. *Lifestyle Enter., Inc. v. United States*, 844 F. Supp. 2d 1283, 1293-94 (Ct. Int'l Trade 2012) (*Lifestyle II*). Because it could be presumed that the import data for lumber included imports of higher-moisture green wood, the Trade Court concluded, use of weight-based data to value the lumber imports "places an artificially low value on the wood used by Yihua Timber because the inclusion of higher-moisture content wood and wood that lacks the value added from the kiln-drying process depresses the surrogate value." *Id.* at 1294.[1] The Trade Court remanded for Commerce either to use the volume-based data in the record or to expand the record. *Id.* at 1297-98. The Trade Court affirmed Commerce's decision to exclude

---

[1]   For example, assume that 1,000 kilograms of green wood has a volume of 1 cubic meter and is valued at $500 ($0.50 per kilogram), while 1,000 kilograms of kiln-dried wood has a volume of 2 cubic meters (because of its lower density) and is actually valued at $1500—reflecting the doubling of wood volume at $500 per cubic meter plus value added by the kiln-drying process. If one knew only the weight of the kiln-dried wood, knew neither the volume nor the value added by kiln drying, and merely applied the weight-based value of the green wood ($0.50 per kilogram) to establish a value, the 1,000 kilograms of kiln-dried wood would be valued at only $500—one third the hypothesized actual value.

Diretso Design's financial statements—the last determination on that issue. *Id.* at 1298.

In its Second Redetermination results, Commerce, under protest, used the NSO's volume-based data, rather than reopen the record. *See Lifestyle Enter., Inc. v. United States*, 865 F. Supp. 2d 1284, 1294 n.13 (Ct. Int'l Trade 2012) (*Lifestyle III*). Commerce rejected Yihua's contention that, if the weight-based import data could not be used, Commerce should either re-open the record or rely on other volume-based data in the record (either information from the U.S. Department of Agriculture about prices of wood exports to the Philippines or information about prices at which certain hardwood lumber was sold in the Philippines). Final Results of Redetermination Pursuant to Second Remand, 11-13 (Dep't Commerce June 11, 2012) (ECF No. 183); *see Lifestyle III*, 865 F. Supp. 2d at 1293-94. On review, the Trade Court rejected Yihua's argument and affirmed Commerce's Second Redetermination results with respect to the valuation of the wood inputs. *Id.* at 1294.[2]

The Trade Court entered the identical judgment not only on the docket of the consolidated case, No. 09-378 in the Trade Court, but also on the docket of each of the consolidated cases, including No. 09-398, the case that Yihua initiated. Yihua appeals the judgment insofar as it affirms the final valuation of the wood inputs using the NSO's volume-based data, while AFMC cross-appeals the judgment insofar as it affirms Commerce's decision not to rely on Diretso Design's financial statements. Both invoke 28 U.S.C. § 1295(a)(5).

---

[2]    The Trade Court remanded a third time for reconsideration of a separate issue that is not before us. Commerce's resolution of that issue led ultimately to the final judgment that is on appeal. *Id.*

That statute gives this court jurisdiction, subject to our resolution of one issue raised by AFMC at the conclusion of the briefing on the merits of the appeal. Concurrent with the filing of its reply brief, AFMC moved for partial dismissal of Yihua's appeal for lack of subject matter jurisdiction. Mot. for Partial Dismissal, *Lifestyle Enter., Inc. v. United States*, No. 2013-1323 (Fed. Cir. Oct. 30, 2013) (ECF No. 61). Specifically, AFMC contended that Yihua lacks standing to argue that Commerce should have valued lumber using weight-based import data rather than volume-based import data. *Id.* at 2-3. This court deferred AFMC's motion for consideration by the merits panel. *Lifestyle Enter., Inc. v. United States*, No. 2013-1323 (Fed. Cir. Dec. 16, 2013) (order) (ECF No. 70). We address this issue below.

## DISCUSSION

### A

Although AFMC acknowledges that "no jurisdictional infirmities regarding Yihua's appeal (Case No. 2013-1323) were raised" in the parties' briefing on the merits, it contends that "further investigation" has revealed that "Yihua lacks standing to assert" that the Trade Court erred in disapproving Commerce's use of weight-based import data in the Final Results and First Redetermination. Mot. for Partial Dismissal at 1. AFMC's motion rests on the fact that only one of the six separate actions challenging Commerce's Final Results presented a challenge to Commerce's use of weight-based data—AFMC's action—and Yihua was not a party to that action. *Id.* at 2, 3. Because AFMC did not raise this objection until after its opening brief on the merits, the objection may succeed only if it bears on our jurisdiction or otherwise justifies the extraordinary step of disregarding AFMC's waiver. We conclude that it does not.

Although AFMC invokes Article III subject matter jurisdiction to justify its eleventh-hour motion on this issue,

Mot. for Partial Dismissal at 1, AFMC does not contend that the three elements required to establish Article III standing are missing here. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (constitutional standing requires plaintiff to establish an "injury in fact," a causal connection between the injury and the conduct complained of, and a likelihood that the injury will be redressed by a favorable decision). There is no doubt that the Trade Court's rejection of use of the weight-based data causes Yihua to lose money (by elevating the duties imposed on its imports) and that reversing the rejection is likely to benefit Yihua. Moreover, Yihua plainly asserts its own legal rights and interests, not those of another, 19 U.S.C. §§ 1516a(a)(2)(A), (f)(3); 28 U.S.C. § 2631(c), thus making immaterial any question about the jurisdictional character of "third-party standing." *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.3 (2014); *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 290 (2008).

AFMC's only real argument invokes *Marino v. Ortiz*, 484 U.S. 301, 304 (1988), for the "rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." Mot. for Partial Dismissal at 4. But that argument is simply misplaced in this case. Yihua appeals the consolidated judgment that was entered in its own suit as well as in the consolidated case and in each of the cases that were consolidated. AFMC is incorrect in its essential premise that Yihua is attempting to appeal only the judgment in a case to which it was not a party. Whatever the scope of the general principle stated in *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496-97 (1933), that "consolidation . . . does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another," it hardly implies that a party to a case may not appeal a judgment entered in that case.

At most, then, AFMC's argument is a waiver argument—that Yihua waived the ability to defend Commerce's reliance on weight-based data because its complaint in its own suit presented a challenge to Commerce's decision on different grounds—a challenge it did not pursue to the briefing stage in *Lifestyle I*—and it did not intervene on Commerce's side in the separate case (AFMC's case) presenting a challenge to Commerce's use of weight-based data. This argument runs into the many decisions that recite the general rule that a party may raise on appeal any issue that was raised *or* actually decided below. *See, e.g.*, *United States v. Williams*, 504 U.S. 36, 41 (1992) (traditional rule "permit[s] review of an issue not pressed so long as it has been passed upon"); *Hollmer v. Harari*, 681 F.3d 1351, 1356 n.3 (Fed. Cir. 2012); *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 707 (D.C. Cir. 2009). Here, the judgment against Yihua rested on the Trade Court's express holding that Commerce could not use the weight-based data on the record that Commerce made.

In any event, we ultimately need not decide the correctness of AFMC's non-jurisdictional waiver argument. AFMC itself waived the argument by failing to raise it until briefing on the merits of the appeal was complete. *See Becton Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990) (arguments not raised until reply brief are waived); *Garlington v. O'Leary*, 879 F.2d 277, 282 (7th Cir. 1989) ("a defense of waiver can itself be waived by not being raised"). And we see no good reason to overlook this waiver on AFMC's part.

AFMC cannot claim surprise or unfairness in the presentation of the issue on appeal, or lack of a full opportunity for AFMC to litigate it or the Trade Court to consider it. AFMC presented its case against Commerce's use of the import weight data not once but twice, and each time the United States defended Commerce's decision before the Trade Court. Yihua's fellow plaintiff, Lifestyle

Enterprise, Inc., also argued before the Trade Court that "Commerce's adoption of WTA weight-based data was supported by substantial evidence." *Lifestyle III*, 865 F. Supp. 2d at 1293. And Yihua itself made its position known long before this appeal. After relying on Commerce to defend use of the weight-based data on the challenge to the Final Results, Yihua defended that position when the matter returned to the Trade Court after Commerce's First Redetermination, *id.* at 1292-93, and on remand to Commerce, Yihua filed a brief reiterating its support of Commerce's use of weight-based import data. Resp. to Mot. for Partial Dismissal at 3-4, *Lifestyle Enter., Inc. v. United States*, No. 2013-1323 (Fed. Cir. Nov. 15, 2013) (ECF No. 67); Ex. 3 to Resp. to Mot. for Partial Dismissal at 4-7. In these circumstances, we have, and will exercise, jurisdiction to decide Yihua's appeal regarding Commerce's use of volume-based import data.

## B

Because we find no defect in Yihua's standing to appeal the final judgment of the Trade Court, we have jurisdiction to review the Trade Court's decision under 28 U.S.C. § 1295(a)(5). In our review on the merits, we evaluate Commerce's underlying decision anew, applying the same standard of review as the Trade Court: we uphold Commerce's determinations of fact unless they are not supported by substantial evidence and review its legal conclusions de novo. *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1357 (Fed. Cir. 2006).

## 1

On appeal from Commerce's Final Results, the Trade Court found that "Commerce failed to explain why it chose gross weight data (from the WTA) over volume data (from the NSO)," and remanded so that Commerce could reconsider the matter. *Lifestyle I*, 768 F. Supp. 2d at 1301-02, 1314. In its First Redetermination results,

Commerce did just that. Because Commerce reasonably chose one of two imperfect data sets, the Trade Court erred in substituting its own judgment for Commerce's.

The statute directs Commerce, when using costs of production to determine the normal value of merchandise from non-market economies, to value the factors of production "based on the *best available information* regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1) (emphasis added). When all the available information is flawed in some way, Commerce must make a judgment call as to what constitutes the "best" information.

In this matter, Commerce explained that much of the NSO's volume-based information (primarily for the veneer and plywood inputs) reflected the use of a standard conversion factor to derive volume from weight, a process that Commerce found not "fully accurate." Final Results of Redetermination Pursuant to Remand at 40-41. Commerce reasoned that the NSO volume data reflected application of the same conversion factor to 38 percent of the relevant wood transactions—involving "many entries from different countries" and "woods of extremely different average unit values"—but it was "highly unlikely that all of these woods could have the exact same density to three decimal points." *Id.* at 10-11, 41. Commerce also found, and it is not disputed in this court, that "the 848 kilograms per cubic meter conversion factor diverges significantly from the specific and average densities of the woods used in calculating normal value for" Yihua (whether lumber, veneers, or plywood). *Id.* at 11. Commerce acknowledged that it could positively confirm the NSO's use of the standard conversion factor for only a "very small" portion of lumber transactions (in quantity and value), unlike for the veneer and plywood transactions, but it added that the NSO's use of the standard conversion factor may have been "masked by the concur-

rent application of specific conversions," as Yihua had argued. *Id.* at 40. Nevertheless, because Commerce concluded that the standard conversion factor rendered the volume-based data less reliable than the weight-based data for valuing Yihua's veneer and plywood inputs,[3] and found no advantage to using volume-based data rather than weight-based data for lumber inputs, Commerce determined that, for consistency, it was best to use the weight-based data set for all types of wood inputs.

In concluding that there was no advantage to using the volume-based data rather than the weight-based data for the lumber inputs, Commerce considered the contention that the weight-based figures were distorted by the presence of green wood in the import transactions, but found no support for the contention in record evidence. On the contrary, Commerce found that it was undisputed that wood density depends not only on moisture content, but on the species of the wood, and that "the surrogate value categories in both the WTA and the Philippine NSO data are basket categories that do not specify the species or moisture content mixes of the wood within each category." Final Results of Redetermination Pursuant to Re-

---

[3] Unlike lumber, veneer and plywood are always already dried when imported. Thus, Commerce concluded that weight-based information about veneer and plywood imports cannot be distorted by the presence of green wood and does not suffer from the standard-conversion problem affecting the volume-based data. As AFMC observes (Cross-Appellant Br. 15 n.5), no party challenged Commerce's use of weight-based import data for veneer and plywood based on the finding that "the use of standard conversions render[s] the NSO volume-based database less reliable for purposes of valuing Yihua's veneer and plywood inputs than weight-based data." Final Results of Redetermination Pursuant to Remand at 42.

mand at 46. Thus, it was impossible to know, based on the record, whether the higher average density of the Philippine imports reflected the presence of green wood, higher-density species, or both. Commerce found that green wood would tend to increase the average density and decrease the surrogate value, while the presence of higher-density species, which are generally more expensive than the low-density species used by Yihua, would tend to increase the average density and also the surrogate value. Commerce concluded that "average values would only be improperly diluted if the mix was disproportionately made up of high moisture green wood," but found "absolutely no record support" for that premise in this case. *Id.* at 45.

Commerce thus acknowledged and evaluated potential problems in using either the weight-based or volume-based data to value the lumber imports. Commerce concluded that the lack of evidence quantifying those problems made it "not possible to assess if and to what extent the use of the weight-based data or the volume-based data distorts the calculation of surrogate values" for the lumber inputs. *Id.* at 47. Therefore, Commerce saw "no basis to state that the NSO volume data is superior" and "no reason to switch" from weight data to volume data for the lumber inputs, adding that "relying on the same source provides some level of consistency for the parties." *Id.*

AFMC has not presented to this court, and the Trade Court did not set out, an adequate basis for rejecting Commerce's reasoning. The Trade Court concluded that green wood "has a definitive value-suppressing effect when weight-based data are used," while "the impact of species mix has variable and indeterminate effects," such that "the record clearly demonstrates that the use of weight-based data understates the wood input surrogate value." *Lifestyle II*, 844 F. Supp. 2d at 1293-94. But whether the weight-based information was reliable de-

pends on the magnitudes of influences pointing in opposite directions, and in any event the question for Commerce was a comparative one: are the weight-based figures more reliable than the volume-based figures? Commerce judged that it could not find that the weight-based figures understated the wood value, or were less reliable than the available volume-based figures, when the mix of moistures was unknown (high-moisture imports push the values lower), the mix of species was unknown (high-value species push the values higher), and either or both components (moisture and species) could account for the higher density of Philippine imports. At the same time, no party challenged Commerce's finding that the volume-based figures were less reliable than the weight-based figures for purposes of valuing the veneer and plywood inputs. Cross-Appellant Br. 15 n.5. AFMC has provided us no basis for rejecting Commerce's ultimate determination that, because it could not find distortions in the weight-based data to be so great as to override identified defects in the volume-based data, the weight-based data constituted the "best available information." 19 U.S.C. § 1677b(c)(1).

In its First Redetermination results, Commerce thus reasonably chose between two flawed data sets. Because it was only under protest that Commerce later revalued the lumber inputs using the NSO's volume-based data, deference to Commerce's reasonable fact finding requires that we reverse the Trade Court's judgment about the wood input valuation and remand for reinstatement of Commerce's First Redetermination on that matter. We do not reach Yihua's alternative argument about which volume-based data should be used if weight-based data could not be used.

2

In its cross-appeal, AFMC presents procedural and substantive challenges to Commerce's decision not to rely

on Diretso Design's financial statements. Neither challenge is convincing.

AFMC contends the Trade Court could not properly set aside Commerce's initial reliance on those statements and remand for reconsideration on the issue, because Yihua did not adequately preserve its challenge to that reliance at the agency level. We see no error in the Trade Court's consideration of this issue. By arguing to Commerce that certain record data regarding Diretso Design's operations in fact corresponded to a different company, Yihua fairly presented to Commerce the basic contention that the "Diretso" entity whose financial statements were being used to value expenses and profits was not the same "Diretso" found to be comparable to Yihua. Regardless of the precise manner in which Yihua presented the issue, which Commerce did not address in its Final Results, it was not an abuse of discretion for the Trade Court to remand for further consideration.

On the merits, we see no error in Commerce's decision on remand to exclude Diretso Design's financial statements from its calculation, or in the Trade Court's decision to uphold Commerce's determination. Substantial evidence supports both AFMC's contention that the diretso.com website belongs to Diretso Design and Yihua's contention that the website *also* belongs to Diretso Trading (a parent or sister company). The indeterminate ownership of the website alleged to establish Diretso Design as a comparable company, coupled with the presence of six other usable financial statements from which to calculate surrogate financial ratios, provided Commerce a sufficient basis for deciding not to rely on the financial statements of Diretso Design. Accordingly, we affirm the Trade Court's decision upholding Commerce's decision about Diretso Design's financial statements.

CONCLUSION

For the foregoing reasons, we reverse the Trade Court's decision to require the use of volume-based data in valuing the lumber inputs, affirm the exclusion of Diretso Design's financial statements, and remand for further proceedings consistent with this opinion.

Each party should bear its own costs.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**