# United States Court of Appeals for the Federal Circuit

---

**HOME MERIDIAN INTERNATIONAL, INC.,**
doing business as Samuel Lawrence Furniture Co.,
and Pulaski Furniture Company,
**GREAT RICH (HK) ENTERPRISES CO., LTD.,**
AND **DONGGUAN LIAOBUSHANGDUN HUADA
FURNITURE FACTORY,**
*Plaintiffs-Appellees,*

AND

**DALIAN HUAFENG FURNITURE GROUP CO.,
LTD.,** AND **NANHAI BAIYI WOODWORK CO., LTD.,**
*Plaintiffs,*

**v.**

**UNITED STATES,**
*Defendant,*

AND

**AMERICAN FURNITURE MANUFACTURERS
COMMITTEE FOR LEGAL TRADE,** AND **VAUGHAN-
BASSETT FURNITURE COMPANY, INC.,**
*Defendants-Appellants.*

---

2014-1251

---

Appeals from the United States Court of International Trade in Nos. 1:11-cv-00325-JAR, 1:11-cv-0326-JAR, 1:11-00356-JAR, 1:11-cv-00360-JAR, and 1:11-cv-00365-JAR, Judge Jane A. Restani.

———————

Decided: December 1, 2014

———————

JEFFREY S. GRIMSON, Mowry & Grimson, PLLC, of Washington, DC, argued for plaintiffs-appellees. With him on the brief were KRISTIN H. MOWRY, JILL A. CRAMER, SARAH M. WYSS, and DANIEL R. WILSON. Of counsel was REBECCA M. JANZ.

J. MICHAEL TAYLOR, King & Spalding LLP, of Washington, DC, argued for defendants-appellants. With him on the brief were JOSEPH W. DORN and MARK T. WASDEN. Of counsel was DANIEL SCHNEIDERMAN.

———————

Before O'MALLEY, TARANTO, and CHEN, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

American Furniture Manufacturers Committee for Legal Trade and Vaughan-Bassett Furniture Company, Inc. (together, "AFMC") appeal from a U.S. Court of International Trade judgment sustaining, after two previous remands, the U.S. Department of Commerce's valuation of inputs for wooden bedroom furniture imported from the People's Republic of China. Because substantial evidence supported Commerce's prior valuation, we *reverse.*

BACKGROUND

In 2005, Commerce published an antidumping duty order on wooden bedroom furniture from the People's Republic of China. In 2010, AFMC requested an adminis-

trative review of certain companies exporting such furniture to the United States between January 1, 2009 and December 31, 2009 ("Period of Review"). After Commerce selected Dalian Huafeng Furniture Group Co., Ltd. ("Huafeng") as the mandatory respondent, Huafeng provided Commerce with data related to its 2008 purchases of the following wood inputs from market economy suppliers relevant to the subject merchandise ("market economy purchases"): pine, poplar, birch, and elm lumber, as well as oak veneer and plywood.

## I. Final Results

In 2011, Commerce assigned Huafeng a dumping margin of 41.75% using 2009 import data from the Phillippines ("surrogate values"), a market economy, to value the relevant wood inputs ("Final Results"). Commerce explained that the surrogate values represented the "best available information" under 19 U.S.C. § 1677b(c)(1) (2012) because they were contemporaneous with the Period of Review, and the market economy purchases identified by Huafeng were not.

Commerce found that 19 C.F.R. § 351.408(c)(1) (2014) and the *Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61716, 61717–18 (Oct. 19, 2006), do not mandate that Commerce only use market economy purchases when valuing inputs, as importer Home Meridian International, Inc., Great Rich (HK) Enterprises Co., Ltd., Dongguan Liaobushangdun Huada Furniture Factory (collectively, "Home Meridian"), and Huafeng suggested. Commerce explained that, although § 351.408(c)(1) provides that Commerce "normally will use the price paid to the market economy supplier" when such data is available, the "word 'normally' provides [Commerce] with the discretion to not use those prices if Commerce believes they do not constitute the best available information for valuing an input."

Joint Appendix ("J.A.") 1000910–11. Commerce clarified that, although the *Antidumping Methodologies* create a rebuttable presumption in favor of using market economy purchases, the presumption only applies when a specified volume of those purchases are made during the period of review. Because Huafeng made no such purchases during the Period of Review, Commerce concluded that the presumption did not apply.

The Court of International Trade remanded the matter to Commerce, finding that Commerce categorically excluded the market economy purchases on the basis of contemporaneity, and failed to make any factual determination on their reliability as indicators of normal value. The court acknowledged that Commerce has long favored contemporaneous surrogate values over non-contemporaneous market economy purchases to value inputs, which the court perceived to be a "blanket rule" Commerce relied on in practice "to the exclusion of all other factors." J.A. 50. The court, however, questioned whether this "blanket rule" was in accordance with the law where, as Huafeng and Home Meridian suggested was the case, the non-contemporaneous purchases constituted 100% of the inputs used to produce the merchandise manufactured and exported during the Period of Review.

## II. First Redetermination

In 2013, Commerce again found that the surrogate values constituted the "best available information" ("First Redetermination"). Commerce acknowledged that it uses contemporaneous market economy purchases when available because those purchases "reflect the respondent's actual [market cost] experience during the [period of review]," but reiterated that Huafeng made no such purchases here. J.A. 1001018.

Commerce concluded that the record did not support Huafeng and Home Meridian's argument that market economy purchases constituted 100% of the inputs used to

make the subject merchandise. First, Commerce found that Huafeng made no purchases of the six relevant wood inputs during the Period of Review. Second, Commerce determined that, in the thirteen months prior to the Period of Review, Huafeng purchased pine, poplar, birch, and elm lumber inputs from both market economy and non-market economy suppliers. Third, Commerce found that for three types of lumber (elm, poplar, and birch) there were sufficient non-market economy purchases to account for 100% of Huafeng's consumption of that lumber during the Period of Review. Fourth, Commerce determined that there was a sufficient quantity of relevant wood inputs in Huafeng's inventory before Huafeng made the market economy purchases that could have covered the consumption of lumber inputs during both 2008 and the Period of Review. Finally, Commerce determined that there was no evidence demonstrating specifically which inputs Huafeng used to produce the subject merchandise.

Commerce then examined the reliability of the surrogate values. Commerce recognized that the Philippine import data reflected higher prices than Huafeng's market economy purchases, but held that the higher prices alone did not render the data aberrational. Commerce referred to Huafeng's acknowledgement that prices can increase, as it purchased a "large quantity of lumber [in 2008] to avoid the risk of prices increasing, which it was predicted may happen." J.A. 1000508, 1001021. In addition, Commerce noted that another similarly situated respondent in China paid prices in 2008 that were significantly higher than Huafeng's market economy purchases and aligned more closely with the surrogate values. Commerce used a Philippine Harmonized Tariff Schedule ("HTS") wooden basket category to value the poplar, birch, and elm lumber inputs. Commerce explained that, while the HTS category did not address each input individually, it was nevertheless contemporaneous with the

Period of Review and "consist[s] of actual prices paid by [market economy] buyers of these wood inputs." J.A. 1001022. Thus, in weighing the merits of the surrogate values and market economy purchases, Commerce determined that the surrogate values represented the "best available information."

The Court of International Trade again remanded the matter to Commerce, with the directive to "use Huafeng's actual [market economy] wood input purchases" for valuation or to reopen the record to make further factual findings regarding whether those purchases represented 100% of the inputs used to produce the subject merchandise. J.A. 18. The court first held Commerce's interpretation of § 351.408(c)(1) to be reasonable, and agreed that the *Antidumping Methodologies* did not require use of the market economy purchases. The court then held that, nevertheless, Commerce improperly found that market economy purchases did not constitute 100% of the inputs used to produce the subject merchandise. The court explained that the record supported the contrary conclusion, including that Huafeng separated its inputs based on country of origin at the manufacturing site and segregated its workshops based on shipping destination. The court held that, although these facts were not definitive, they still outweighed Commerce's "zero evidence to the contrary." *Home Meridian Int'l, Inc. v. United States*, 922 F. Supp. 2d 1366, 1376 (Ct. Int'l Trade 2013).

AFMC then filed a Motion for Reconsideration or, in the Alternative, for an Order Directing Commerce to Reopen the Record, which the Court of International Trade denied.

### III. Second Redetermination

On remand for the second time, Commerce first determined that it did not need to reopen the record because the "best available information" analysis focuses on the purchase of inputs, not consumption thereof, and reopen-

ing the record to make factual determinations regarding consumption would thus be futile ("Second Redetermination"). Commerce then verified that the market economy purchases were in fact from market economy suppliers, and used those values to assign a new dumping margin of 11.79%.

The Court of International Trade sustained the Second Redetermination. AFMC timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review Commerce's factual determinations for substantial evidence, and its legal conclusions de novo. *Lifestyle Enter. v. United States*, 751 F.3d 1371, 1378 (Fed. Cir. 2014). We do not limit our review to Commerce's Second Redetermination and the Court of International Trade's decision thereon, as our review extends to the interim decisions of Commerce and the Court of International Trade as well. *Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 (Fed. Cir. 2007). We reject appellee's suggestion that we are barred from considering interim decisions rendered by Commerce whenever Commerce renders an alternative final determination after remand. As our precedent makes clear, our ability to review interim decisions is preserved for final review, regardless of changes to those decisions which occur post-remand. *Id.*

We first address whether Commerce properly interpreted § 351.408(c)(1) and the *Antidumping Methodologies*, and then turn to the question of whether substantial evidence supported Commerce's valuation of inputs prior to the Second Redetermination.

## I.

As a general rule, we defer to an agency's interpretations of a regulation it promulgates if the regulation is ambiguous and the agency's interpretation is not plainly

erroneous or inconsistent with the regulation. *Gose v. U.S. Postal Serv.*, 451 F.3d 831, 836 (Fed. Cir. 2006).

Commerce properly interpreted § 351.408(c)(1) as not requiring the use of market economy purchases for valuation when they do not constitute the "best available information." Commerce correctly interpreted the *Antidumping Methodologies* presumption as applying only to situations where a certain volume of market economy purchases are made during the relevant period of review.

For merchandise exported from a non-market economy, like the People's Republic of China, Commerce determines normal value for dumping margin calculations on the "basis of the value of the factors of production [like raw material inputs] utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1),(3). Commerce must value these factors based on the "best available information." *Id.* § 1677b(c)(1)(B).

"Best available information" can constitute surrogate values or market economy purchases. Commerce typically uses surrogate values, which are "prices or costs of factors of production in one or more market economy countries that are . . . at a level of economic development comparable to that of the nonmarket economy country, and significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). Section 351.408(c)(1), however, provides that, when a respondent purchases inputs produced in a market economy country from a market economy supplier with market economy currency, Commerce "normally will use" this market economy purchase price for valuation "if substantially all of the total volume of the factor is purchased from the" supplier. Based on § 351.408(c)(1), Commerce created a rebuttable presumption that, generally in situations where there are both market and non-market economy purchases made during

the period of review, Commerce will use market economy purchases to value the entire input if those purchases exceed thirty-three percent of the total volume of inputs from all sources during the period. *Antidumping Methodologies*, 71 Fed. Reg. at 61717–18.

Thus, no regulation or statute imposes a strict requirement on Commerce to use non-contemporaneous market economy purchases rather than contemporaneous surrogate values, or vice versa, in valuing inputs for the calculation of a dumping margin. Commerce, instead, must only determine what set of data represents the "best available information." Commerce's interpretation of § 351.408(c)(1), specifically its language that Commerce "normally will use the price paid to the market economy supplier," was reasonable because the word "normally" indicates that Commerce has the discretion not to use market economy purchases when it does not constitute the "best available information."

Home Meridian and AFMC advance alternative interpretations, but both are misplaced. Home Meridian argues that Commerce *must* use the market economy purchases for valuation and that there is no contemporaneity requirement in § 351.408(c)(1). Neither the regulation nor the governing statute, however, prohibits Commerce from relying on contemporaneity as a factor in valuation, and Commerce is not required to use market economy purchases when they do not constitute the "best available information." AFMC contends that § 351.408(c)(1) and the *Antidumping Methodologies*, read together, allow Commerce to completely disregard market economy purchases. This is an overstatement. Here, Commerce correctly determined from the unambiguous language of the *Antidumping Methodologies* that the presumption to use market economy purchases did not apply because Huafeng made no such purchases during the Period of Review. Nevertheless, neither § 351.408(c)(1) nor the *Antidumping Methodologies* per-

mits Commerce to *categorically exclude* market economy purchases without making a factual determination as to the extent to which they inform the inquiry into what is the best available information for valuing the relevant inputs.

Commerce therefore did not err in interpreting § 351.408(c)(1) or the *Antidumping Methodologies.* That these interpretations were proper is not dispositive, however, as Commerce was still required to weigh the reliability of the market economy purchases against the surrogate values.

## II.

Although substantial evidence did not support Commerce's valuation of inputs in the Final Results, substantial evidence supported Commerce's valuation in the First Redetermination. Substantial evidence did not support Commerce's valuation in the Final Results because Commerce failed to make any factual determination as to the reliability of the market economy purchases or weigh the merits of those purchases against the surrogate values.

Substantial evidence supported Commerce's valuation in its First Redetermination, however, and the Court of International Trade erroneously held otherwise. Commerce has a longstanding practice of favoring contemporaneous surrogate values over non-contemporaneous market economy purchases because, according to Commerce, those surrogate values more accurately reflect the respondent's actual market cost experience during the relevant period of review. The Court of International Trade only questioned whether that practice extends to situations where 100% of the inputs used to produce the subject merchandise are non-contemporaneous market economy purchases.

Commerce properly determined that the record did not support Huafeng and Home Meridian's assertion that

100% of the inputs used to produce the subject merchandise were market economy purchases. Huafeng's "Market Economy Purchases Spreadsheet" endorses Commerce's conclusion. Commerce could have reasonably inferred from the spreadsheet that Huafeng purchased only two of the wood inputs (oak veneer and plywood) exclusively from market economy suppliers in 2008. J.A. 1000469. The spreadsheet also indicates that Huafeng purchased the four remaining types of wood inputs from *both* non-market and market economy suppliers in 2008. *Id.* Commerce further found that, for three types of lumber, there were sufficient non-market economy purchases to provide 100% of the lumber consumed during the Period of Review. There is no evidence demonstrating which of these units Huafeng used to produce the subject merchandise.

Additionally, there was no evidence in the record to corroborate Huafeng and Home Meridian's assertion to the contrary. For example, Huafeng never provided a verified statement that it only used market economy purchases to produce the subject merchandise. Huafeng and Home Meridian only made this assertion through counsel in briefs before Commerce. Commerce was not required to prove a negative, and did not need to find affirmative evidence demonstrating that Huafeng did not use market economy purchases of wood inputs to produce the subject merchandise.

Commerce acknowledged the flaws of the surrogate values but concluded that they represented a more accurate reflection of Huafeng's actual market cost experience. Substantial evidence supported that conclusion. Commerce, for instance, addressed the fact that the surrogate values were higher in price than the market economy purchases, but found that the difference alone did not render the surrogate values misrepresentative. Even Huafeng acknowledged that price increases are not an abnormal occurrence, stating that it purchased large

quantities of lumber in 2008 to "avoid the risk of prices increasing." J.A. 1000508. Furthermore, though the HTS wooden basket category used to value poplar, birch, and elm lumber inputs does not address each type of input individually, it was not unreasonable for Commerce to find the category more reliable than the market economy purchases because the category was contemporaneous with the Period of Review and reflected actual prices that market economy buyers paid for those inputs.

The data on which Commerce relies to value inputs must be the "best available information," but there is no requirement that the data be perfect. Here, Commerce gave considerable weight to contemporaneity, as the Court of International Trade recognized Commerce often does when comparing contemporaneous surrogate values with non-contemporaneous market economy purchases. *See Home Meridian Int'l Inc. v. United States*, 865 F. Supp. 2d 1311, 1317 n.5 (Ct. Int'l Trade 2012). Though contemporaneity may not necessarily outweigh all other factors where the only inputs used to produce the subject merchandise are market economy purchases, Commerce properly determined from the record that, here, the inputs could not have been all market economy purchases. Substantial evidence therefore supported Commerce's valuation of the wood inputs in its First Redetermination.

We have considered Home Meridian's remaining arguments concerning Commerce's valuation in the First Redetermination, and find them unpersuasive. In view of our conclusion, we find it unnecessary to address the merits of Commerce's Second Redetermination, and the Court of International Trade's decision thereon. *See Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 (Fed. Cir. 2007).

CONCLUSION

For the reasons stated above, we hold that substantial evidence supported Commerce's valuation in its First

Redetermination, and the Court of International Trade incorrectly found otherwise. We, accordingly: (1) vacate Commerce's Second Redetermination and the Court of International Trade's decision thereon; (2) reverse the Court of International Trade's decision on Commerce's First Redetermination; and (3) direct the Court of International Trade to reinstate Commerce's valuation in the First Redetermination.

**REVERSED**